No. 90,613

STATE OF KANSAS, *Appellee,* v. ABEL TORRES, *Appellant.*

(121 P.3d 429)

Opinion filed October 21, 2005.

*Shawn E. Minihan*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Melissa G. Johnson*, special assistant county attorney, argued the cause, and *Wade M. Dixon*, special assistant county attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Abel Torres appeals his conviction of felony murder of his 21-month-old daughter, based on the underlying crime of felony abuse of a child. Our jurisdiction is under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed).

Torres presents multiple issues on appeal. Those issues, and our accompanying holdings, are as follows:

1. Was there sufficient evidence to convict Torres of felony murder? Yes.
2. Was Torres' Sixth Amendment right to confront the witnesses against him violated when the State placed into evidence statements he gave to law enforcement officials? No.
3. Were Torres' constitutional rights violated because:
   (a) The State failed to record his two interviews by law enforcement officials? No.
   (b) The district court failed to instruct the jury on the state's failure to record the interviews? No.
4. Did the district court err by allowing evidence of Torres' statements to law enforcement officials? No.
5. Did the district court err by failing to give jury instructions for the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter? No.
6. Did the district court err in admitting certain autopsy photographs? No.
7. Did the district court err in denying a motion for mistrial based upon allegations of prosecutorial misconduct for witness tampering? No.
8. Did the district court err in allowing the jury to see demonstrative illustrations on "shaken impact" and "shaken baby" syndrome? No.

9. Did the district court err in allowing the State to call six expert witnesses? No.
10. Did the district court err by failing to exclude certain testimony of expert witness Dr. Mary Dudley? No.
11. Did the cumulative effect of any errors deprive Torres of his right to a fair trial? No.

Accordingly, we affirm the district court.

## FACTS

Tianna Rodriguez was almost 21 months old at the time of her death on June 27, 2001. She lived with her mother, Susan Rodriguez, and her father, Abel Torres, in Leoti.

Tianna had been sick with a fever and vomiting on Sunday, June 24, but her condition appeared to improve the next day. On Monday, June 25, Tianna and her parents visited her grandparents and returned home. Later that day, Torres drove Susan to work and Tianna rode with them.

That evening, Torres called his mother, Teresa Torres, and told her that Tianna was playing with her dolls in the front room and waiting for supper. A few seconds later, Torres called Teresa again and said, "[M]other, come quick, she fell and she's unconscious." Teresa drove to the house and noticed that Tianna's clothing was wet. Teresa ran her to the bathroom and put water on her face, but there was no response, so Teresa called the hospital.

Emergency medical technician (EMT) personnel arrived at the house and found Tianna unresponsive and her breathing shallow. Tianna was taken by ambulance to the Wichita County Hospital in Leoti.

While Susan was at work, she received a phone call to go to the emergency room because something was wrong with Tianna. Susan arrived as Tianna was being brought in. While the medical personnel were trying to revive Tianna, Susan asked Torres what happened. Torres said that Tianna fell off a chair.

At the hospital Dr. David Thetford, a Leoti physician, observed that every couple of minutes Tianna was having what appeared to be seizures. She also had a slight temperature and an elevated white blood cell count. Tianna's condition did not change at the

hospital, and she remained unresponsive. Concerned that she might have an infection, Dr. Thetford arranged transfer to St. Catherine's Hospital in Garden City for pediatric evaluation and further treatment. Dr. Thetford did not believe that Tianna's condition was consistent with the report that she had fallen off of a chair.

Tianna was taken by ambulance to Garden City for a CAT scan. She remained totally unresponsive and her eyes were dilated, but she was breathing fine and there were no more seizures. Tianna arrived at St. Catherine's Hospital at 9 p.m.

Dr. Soen B. Liong is a radiologist at St. Catherine's Hospital who consulted on Tianna. According to him, CAT scans of Tianna's brain and spine showed swelling, fresh blood up to 2 days old, as well as a small amount of old blood up to a week old. He diagnosed an intentional injury, *i.e.*, shaken baby syndrome.

Dr. James Zauche is a pediatrician who treated Tianna at St. Catherine's. According to him, Tianna had abnormal findings on the neurological exam, her eye exam was not normal, and she was showing abnormal movements consistent with a brain injury. Dr. Zauche's first diagnosis was that Tianna had a hemorrhage in her brain, which necessitated her transfer to Wichita. His second diagnosis, based on Dr. Liong's findings, was that the injuries were consistent with shaken baby syndrome. Dr. Zauche did not believe that the injuries were consistent with falling off a chair.

Tianna was then flown to Wesley Medical Center in Wichita and entered the intensive care unit. Dr. Lindall Smith made contact with her around 2 a.m. on Tuesday, June 26. A CAT scan was taken approximately 3 hours after the one in Garden City. During this interval, brain swelling had increased significantly. According to Dr. Smith, Tianna responded only to painful stimuli, and her response was to posture, that is, to stiffen her arms or legs. Posturing is a very minimal response that Dr. Smith sometimes sees with severe head injuries. Tianna also had bilateral retinal hemorrhages and high levels of intracranial pressure.

During this time, Wesley personnel obtained Tianna's medical history from her parents. On June 24, she had a fever and vomiting and was not her usual active self. By the next day, however, she

was back to normal. Tianna and Torres had supper together and were sitting in a rocking chair. Torres got up out of the chair to leave the room leaving Tianna in the chair. Torres heard her fall, returned to the room, and found Tianna face down on the floor fairly unresponsive.

According to the medical history provided, Tianna also had fallen out of a grocery cart onto a concrete floor in May or April of 2001 but did not have any loss of consciousness from that fall. There was also a suspected fall from her bed several weeks before the June 2001 fall from her chair. She was thought to have been jumping on her bed and had some kind of mark on her face. Tianna was taken to the local ER and evaluated, but she was not thought to have any loss of consciousness or any significant findings of neurological impairment.

On Tuesday, June 26, the day Tianna arrived in Wesley, Susan again asked Torres what had happened to Tianna the previous day. Torres again replied that she had fallen off the chair. Susan told Torres she had been informed of his shaking Tianna. He then admitted to shaking her but claimed he had not done so on purpose. Susan had another telephone conversation with Torres early in the morning on Wednesday, June 27. At this time, he told her that Tianna had simply fallen and that he had not done anything.

After Torres returned to Leoti, he and his mother went to the hospital there to talk with Dr. Thetford. Dr. Thetford told them that Torres needed to talk to the sheriff and that everybody who had been around Tianna was a suspect.

Karen King is a social worker at Wesley Medical Center assigned to cover possible child abuse cases. She had several conversations with Susan throughout the day on June 27. King was present while Susan phoned Torres from King's office. According to King, Susan asked Torres, "Did you shake her?" Susan then said, "Why didn't you tell me? We could have gotten her help sooner." Susan was upset and was crying and told Torres, "I don't hate you. I will always love you." King believed that Torres was admitting that he had shaken the child. After Susan finished the call, she confirmed to King that Torres said he had shaken Tianna three times.

Later that day, on June 27, after a series of tests, the doctors determined that Tianna was brain dead and removed her from support at 12:55 p.m.

On the day of Tianna's death Kelly Robbins, a special agent for the KBI who was assigned to this case, and Wichita County Sheriff Wayne Collins interviewed Torres from 8:30 to 10:30 a.m. in Leoti at the sheriff's department. Robbins testified:

"He [Torres] said that they had slept late on Sunday [June 24], gotten up around 10 to 11 a.m. and they had breakfast. Around 1:30 p.m. Tianna was fussy and he took her into his and Susan's bedroom. While in the bedroom Tianna was hitting and kicking and biting him, trying to get away from him. He — to try and keep her from doing this and to calm her down, he said that he would grab her by her hands and pull her real hard towards him. Then he would put his arms around her, trying to keep her from the kicking and hitting until she calmed down. He said then he would — once she calmed down, he would sit her next to him or lay her down next to him and he would try to be real nice to her like trying to get her to give him a hug or give her babies a hug. Then all of a sudden she would snap again, start the crying and fighting him, trying to get away from him, so he would grab her hands again, pull her real hard towards him. And then he would put his arms around her and try to control her again. He said that happened about three times during that period. . . . He said that he pulled her hard enough by her hands that her head would bounce and that he felt that it could have hurt her, it was that hard. Also, when he was putting his arms around her to try and control her, he said that he squeezed her hard enough that he felt that it could have broken her rib."

According to Robbins, Torres said that the last time Torres pulled and squeezed Tianna, she became hysterical and vomited shortly afterward. She continued to vomit. Torres and Susan gave her a cool bath to cool her off. During that time she acted really tired, her eyes would roll back in her head, and she was having a hard time staying awake. They called the hospital, received instructions on what to do, picked up medicine and papers from the hospital, and watched her throughout the evening. Tianna continued to vomit until midnight, when she was able to keep some food and liquid down.

Torres told Robbins that on Monday, June 25, they got up late and had breakfast. Tianna was still very weak and stumbling some when they went to his parents, but she was better than the day

before. Susan went to work around 4 p.m., and Torres stayed home to watch Tianna.

According to Robbins:

"He [Torres] said he fed her spaghetti and meatballs that evening, and after she had eaten, he put her in the green swivel chair with her dolls or her babies, and then he had walked out of the room, and that's when he heard Tianna fall. When he came into the room, she was lying face down on the floor in front of the green swivel chair holding her head with her hands. . . . He said that he went over to her. She was not breathing real well. He gave her a few breaths with CPR. He had — and then she went unconscious. He panicked and called his mother."

Robbins testified that Torres said he did not intend to harm his daughter and that he forgot how fragile she was and how much bigger he was than she was. He said that he was just trying to make Tianna like him and that he just got too rough with her. Torres was allowed to leave the sheriff's department with his mother after the interview.

Robbins and Collins interviewed Torres at the sheriff's department again on July 6, 2001, 9 days after Tianna's death. They asked Torres to come in and visit with them because they had additional information from the autopsy. Robbins testified about what Torres told them on that date:

"He said that after Susan — they dropped Susan off for work [on June 25], him and Tianna drove around listening to music for about 15 minutes. When they got home, he did feed her spaghetti and meatballs. She was sitting on his lap. They were sitting on the green swivel chair, fed her a little bit, and she got sick and vomited all over him, and this made him very upset and mad.

"He said that he did not want to hurt Tianna by spanking her for what she did, so instead, he took her into his and Susan's bedroom and stood at the foot of the bed and threw Tianna very hard to the top of the bed. He was aiming for the pillows, but he missed the pillows, and the right side of her head hit the end table that's on the west side of the bed.

"He said that when she hit that end table, she screamed and held her head. He knew that from the scream he had hurt her pretty bad. He went over and picked her up and she was unconscious in his arms. He took her shirt off, was going to try and give her a cool bath again to try and revive her, and he realized she was in pretty bad shape.

"He panicked and said — called his mother who came over. She, again, did try to wipe her down and realized that that was not going to work and his mother called the hospital for an ambulance."

At the end of the interview, Robbins asked Torres if he wanted to have Robbins tell his mother and father what happened, or if Torres wanted to tell them. Torres spoke to his mother alone in the interview room but told Robbins he did not want to talk with his father. Torres told Robbins that he wanted to talk to his mother first and then he was going home to tell Susan what happened. He then left the sheriff's department.

That same day, July 6, Susan had a conversation with Torres outside her home. According to Susan, Torres also told her that he was feeding Tianna and she had thrown up on him. He took her to the bedroom, shook her, and tossed her onto the bed, but she bounced and her head hit a night stand. Susan's impression was that Torres had shaken Tianna violently.

Torres was arrested for Tianna's death 3 days later on July 9.

Several medical experts testified in detail at the trial, giving their medical opinions on what caused Tianna's injuries and resulting death. Highly summarized, the experts testified that Tianna suffered from severe brain injury, retinal hemorrhages, a linear skull fracture, swelling and flattening of the brain, fractures of her first, second, and eleventh ribs, injuries to her hands and feet, and various bruises.

Dr. Smith of Wesley Medical Center did not believe that Tianna could have been injured on Saturday (June 23) to cause this type of brain injury. He also testified that a child of Tianna's age and size could not sustain these injuries from falling off of a chair. He testified that the injuries could be consistent with someone violently shaking her, throwing her approximately 7 feet, and hitting her head on the side of an end table.

Dr. Debra Desilet-Dobbs, a pediatric radiologist, testified that the presence of both the subdural hematoma and the brain injury indicates very significant intense trauma. According to her, these injuries are seen in high-speed head-on vehicle collisions and, in the nonaccidental cases, with violent shaken impact. She testified that both injuries were caused by the same event. Dr. Desilet-Dobbs found that it was highly unlikely the injury occurred before Sunday, June 24.

Dr. Mary Dudley is an expert in shaken baby syndrome and shaken impact syndrome and performed the autopsy on Tianna on June 28, 2001. Her diagnosis of Tianna's death was shaken impact syndrome. According to Dr. Dudley, the injuries would not be consistent with falling from a chair and a previous falling out of a grocery cart. The injuries would, however, be consistent with shaking and throwing a child the length of a bed causing the child to strike her head on a night stand. Tianna's injuries indicate both a shaking and an impact.

Dr. Katherine Melhorn is a pediatrician and faculty member at the University of Kansas School of Medicine in Wichita. She was consulted as a physician on the care team when Tianna was admitted to the hospital. Dr. Melhorn observed bruises on the left side of her chest and retinal hemorrhages in both eyes but not a lot of obvious external injuries.

For the defense, Dr. Richard Gilmartin, a child neurologist, testified as an expert witness on head injuries resulting from child abuse. Dr. Gilmartin reviewed Tianna's outpatient records and testified that there was no evidence that Tianna was shaken. In Dr. Gilmartin's opinion, Tianna died of trauma, brain swelling, and uncal herniation. He testified that brain swelling that began on Monday, June 25, could not cause the brain sutures to stretch apart so quickly. While he believed that Tianna died as a result of severe child abuse, he did not believe that throwing a child 6 or 7 feet into a night stand would inflict an injury sufficient to cause death.

Torres called several other witnesses to testify about Tianna's activities and injuries prior to her death.

After the jury convicted Torres of first-degree felony murder based on the underlying crime of felony abuse of a child, he was sentenced to life in prison, with no eligibility of parole for 20 years.

## ANALYSIS

Issue 1: *Was there sufficient evidence to convict Torres of felony murder?*

Torres first alleges insufficient evidence to support his conviction.

Our standard is well-known:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Burhans,* 277 Kan. 858, 871, 89 P.3d 629 (2004).

For a conviction of felony murder, the factfinder must find that the killing of a human being was committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401. Abuse of a child is listed as an inherently dangerous felony in K.S.A. 21-3436(a)(7), whether or not it is so distinct from the homicide as not to be an ingredient of the homicide. Abuse of a child is defined as "intentionally torturing, cruelly beating, shaking which results in great bodily harm or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." K.S.A. 21-3609.

Torres specifically argues the State failed to sufficiently show intentional, cruel, and inhuman bodily punishment and that his actions caused Tianna's injuries.

It was undisputed that Torres was the only person with Tianna when she became unconscious. Susan and Kelly Robbins both testified that Torres admitted to them that he shook the 21-month-old Tianna and threw her toward the bed but Tianna hit her head on a night stand. Dr. Liong and Dr. Zauche testified that the injury was an intentional injury, shaken baby syndrome, and that Tianna's injuries were not consistent with falling off a chair. Dr. Smith and Dr. Desilet-Dobbs gave opinions that Tianna's injury occurred shortly before she became unresponsive on June 25. Dr. Dudley testified that Tianna's injuries indicated both a shaking and an impact. Even Torres' own expert, Dr. Gilmartin, testified that though he felt there was no evidence Tianna was shaken, he believed that she died as a result of severe child abuse.

In viewing the evidence in the light most favorable to the prosecution, we conclude a rational factfinder could find beyond a reasonable doubt that Torres committed felony murder based on the underlying felony of abuse of a child.

Issue 2: *Was Torres' Sixth Amendment right to confront the witnesses against him violated when the State placed into evidence statements he gave to law enforcement officials?*

Torres complains that his Sixth Amendment right of confrontation was violated when the State presented the jury with evidence of his statements to law enforcement officers. This Sixth Amendment argument was not presented to the district court, and no objection was made when the statements were introduced into evidence. Generally, where constitutional grounds are asserted for the first time on appeal, they are not properly before this court for review. *State v. Denney*, 278 Kan. 643, 651, 101 P.3d 1257 (2004). Additionally, a timely and specific objection for the admission of evidence is necessary to preserve the issue for appeal. *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001); see K.S.A. 60-404.

Because this argument appears to be recurring, however, we will address it now.

The Sixth Amendment of the United States Constitution provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him*; to have compulsory process for obtaining Witnesses in his favor, and to have the assistance of counsel for his defense." (Emphasis added.)

Torres relies heavily upon *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), as support for his argument. In *Crawford*, the Court held that testimonial statements of unavailable witnesses are inadmissible unless the defendant was afforded an opportunity to cross-examine those witnesses. Torres claims that *Crawford* also applies to defendant's statements to police. While the *Crawford* Court stated that statements taken during police interrogations are testimonial, the Court was clearly discussing interrogations of people other than the defendant.

Torres claims that he is in a "catch-22" in that either he can forego his Fifth Amendment right against self-incrimination and testify himself about the alleged statements, or he can exercise his

Fifth Amendment right and allow the unchecked testimonial statements into evidence. He argues that this dilemma, created by the statements' admission into evidence, is a violation of the doctrine of unconstitutional conditions, as illustrated by *Simmons v. United States*, 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968).

In *Simmons*, a defendant testified at his unsuccessful motion to suppress. The Government then used this testimony against the defendant at trial. The United States Supreme Court found that the testimony at the motion to suppress should not have been admissible at trial on the question of guilt or innocence. 390 U.S. at 390. The Court reasoned that such a scenario required the defendant seeking to suppress evidence to either give up a potentially valid Fourth Amendment claim or waive his Fifth Amendment privilege against self-incrimination, something the Court found to be intolerable. 390 U.S. at 394.

Torres' right against self-incrimination and his right to confront the witnesses against him are not conflicting. Torres was not compelled to disclose information to law enforcement, but he chose to do so. We are unaware of any authority holding that "confronting oneself" at trial under these circumstances is a right guaranteed by the Sixth Amendment. Torres fails to show that his Sixth Amendment rights were violated.

Issue 3: *Were Torres' constitutional rights violated because:*

*(a) The State did not record his two interviews by law enforcement officials?*

*(b) The court failed to instruct the jury on the State's failure to record the interviews?*

Torres claims that his constitutional rights were violated because the State failed to preserve potentially useful evidence, *i.e.*, failed to record his two interviews with law enforcement. He cites *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), as the basis for the recording requirement.

The failure to record an interview through audio or video technology is not within the realm of the *Youngblood* decision. The *Youngblood* Court spoke about evidentiary material that "could

have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57.

Moreover, the Court in *Youngblood* stated that it was unwilling to read the "fundamental fairness" requirement of the Due Process Clause "as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). Instead the Court required a defendant complaining of the State's failure to preserve evidence to show bad faith on the part of the police. 488 U.S. at 58. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58.

Torres claims that the failure to record the interviews is per se bad faith, but cites no authority for this argument. We have held that " '[s]imply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority or in the face of contrary authority, is akin to failing to brief an issue. "Where the appellant fails to brief an issue, that issue is waived or abandoned." ' " *Mid-Continent Specialists, Inc., v. Capital Homes, L.C.*, 279 Kan. 178, 191, 106 P.3d 483 (2005).

While some states have passed legislation to require the recording of certain interrogations, the Kansas Legislature has not. See *United States v. Lewis*, 355 F. Supp. 2d 870, 872 (E.D. Mich. 2005). At least two state courts have determined that the recording of interrogations is required. See *Stephan v. State*, 711 P.2d 1156, 1159-60 (Alaska 1985); *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994). We decline to hold that recording is required under the United States and Kansas Constitutions.

Torres argues in the alternative that the jury should have received an instruction that it could draw an inference against the State based on the failure to record his interviews.

Torres did not request such an instruction. Accordingly, our standard of review is whether failing to give the instruction was clearly erroneous. K.S.A. 2004 Supp. 22-3414(3). Instructions are clearly erroneous if the reviewing court is firmly convinced that

there is a real possibility the jury would have returned a different verdict if the trial error had not occurred. *State v. Lowe,* 276 Kan. 957, 963, 80 P.3d 1156 (2003).

As stated above, law enforcement officials had no duty to record the interviews. We see no basis to conclude that the failure to give this instruction was clear error.

Issue 4: *Did the district court err by allowing evidence of Torres' statements to law enforcement officials?*

Torres next claims that the district court erred in denying his motion to suppress his statements to law enforcement officials. More specifically, he claims they were elicited in custodial interrogations in which law enforcement failed to advise him of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 358 U.S. 890 (1966). The State denies the interviews were custodial interrogations.

We addressed the identical issue in *State v. James,* 276 Kan. 737, 749, 79 P.3d 169 (2003), where we stated:

> "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him or her 'in custody.' *State v. Fritschen,* 247 Kan. 592, Syl. ¶ 2, 802 P.2d 558 (1990). The threshold issue is therefore whether [defendant] was in custody when the statements were made; this determination is made on a case-by-case basis according to the facts. 247 Kan. at 597, 603. An objective standard is used to judge whether an interrogation is custodial. The proper analysis is how a reasonable person in the suspect's position would have understood the situation. 247 Kan. 592, Syl. ¶ 2."

The district court determined that Torres was not in custody at the time he gave the statements. In *State v. James,* 276 Kan. at 750, we confirmed our two-step standard for reviewing the issue of whether custody existed at the time a defendant's statements were made that he or she later wishes to suppress:

> "[T]he standard to be applied is that the appellate court reviews the factual underpinnings of a district court's decision that the defendant was not in custody by a substantial competent evidence standard and the ultimate legal decision drawn from those facts by a de novo standard."

We therefore first determine if the district court's findings in the instant case were supported by substantial competent evidence. It stated:

"Well, after having heard the evidence, the Court finds that the defendant voluntarily presented himself on both occasions to the Wichita County Sheriff's Office; that his effort there was as much to share information as to give information and to — and each party apparently gave information to the other. That on both occasions the defendant was free to leave, if he chose to. That, in fact, on the second interview both Sheriff Collins and Special Agent Robbins got up and left the room, left the door open, the defendant remained there of his own free will. The Court doesn't see any — the Court admits that the defendant may have been under some emotional distress because — on the first occasion because of the condition of his daughter and on the second occasion because of her relatively recent funeral. But even though the defendant may have been under emotional distress, his statements were still freely and voluntarily given, that this was clearly an investigatory interrogation or interview as opposed to a custodial interrogation and interview; that Miranda warning was not necessary considering the circumstances of these two interviews. So the defendant's motion to suppress is denied."

At the suppression hearing, Kelly Robbins, Donald Collins, Michael Wilson, and Abel Torres each testified regarding the circumstances surrounding the two interviews.

*June 27 Interview*

According to the law enforcement witnesses, Robbins and Collins interviewed Torres on June 27, 2001. When Robbins arrived at the sheriff's department, Torres and his mother were waiting there, although nobody in law enforcement had asked them to appear. The interview took place in an interview room at the sheriff's department. It is a medium-sized room with a desk and three or four chairs. The door was shut for privacy, but Torres was never told that he could not leave or that he was under arrest. The interview lasted from 8:30 a.m. until 10:30 a.m. Torres never indicated that he wanted to leave and was not physically restrained. Torres was very upset about what was going on and cried at times. During the interview, officers spoke about Tianna's condition, particularly her broken ribs and subdural hematoma. When the interview was completed, Torres drove away with his mother.

According to Torres, he went to the sheriff's department after a doctor advised him to speak with the sheriff. He went to find out exactly what was going on with his daughter. Torres had gone to Wichita on June 26 and had come back to Leoti that evening around 7 p.m. He testified that he stayed up almost all night, sleep-

ing only a few hours. When he arrived at the sheriff's department, Robbins and Collins greeted him and told him they would like him to go to the interview room so they could ask him some questions. The officers shut the door, asked Torres to sit down, and started asking him questions. Torres felt depressed, tired, and worried, and was crying at some points. He did not recall being told that he could leave. Toward the end of the interview, Torres asked if he could leave to go home and find out Tianna's status. Torres testified that he did not feel like he could just get up and walk out because of the way he was being questioned and the attitude he was getting from the officers. He stayed because he felt obligated to provide as much information as he could.

## July 6 Interview

According to law enforcement officials, the second interview occurred July 6, 2001, 4 days after Tianna's funeral. The undersheriff, Randy Keeton, made contact with Torres and asked him to come in on the 6th, saying that the officers wanted to visit with him again. Torres drove himself to the interview, and his parents came in a separate car. The interview was in the same room as before, and the door was shut for privacy. The interview began around 4 p.m. and ended around 5 p.m. Torres was not told that he could not leave or that he was under arrest, and he was not physically restrained during the interview. At that time, Torres was the only person considered to be a suspect.

At various times during the interview, Torres was upset and cried. At one point, Sheriff Collins thought Torres was lying to him and said, "Let's cut the bullshit. If you are going to lie to me, just get up and leave, go home, and we'll just go with it." After the interview, Torres visited with his mother, and his mother asked Robbins to visit with them about whether Torres could go back to work. Robbins told her that they would be taking the information to the county attorney, who would decide on what charges, or if charges would be filed. Robbins told Teresa that it was fine for Torres to go to work as long as they were able to contact him. Torres left with his parents after the interview.

According to Torres, the July 6 interview began with Collins accusing Torres of lying about where the 911 phone call had been made. Torres testified that the Collins then yelled at him to "cut the bullshit and stop lying" and that he should stop trying to cover himself. Torres testified that he did not feel free to leave, because at one point the door was open and Collins was pacing in front of the doorway. The door had been closed at the beginning of the interview. Torres testified that Collins never told him to leave but said that if Torres was going to lie, that he would just leave. According to Torres, he felt obligated to say something at that point. He was surprised when he was told that he could go home. He was told not to leave the county.

The trial court's factual findings described earlier are supported by the testimony of law enforcement, *e.g.*, Robbins and Collins, and to some extent, by Torres. Their testimony constitutes substantial competent evidence.

We next consider step two in our analysis, a "de novo" review of the legal question relating to custody. See *State v. James*, 276 Kan. at 753. The district court concluded the interviews were not custodial interrogations that would require *Miranda* warnings. We observe that Torres drove himself to both interviews and appeared without law enforcement invitation for the first one. Either his mother or both parents were at the sheriff's department at the time of the interviews. He was not physically restrained at any time. He left the sheriff's department after both interviews were completed. His mother was told he could return to work. Although Collins testified that Torres was considered a suspect at the time of the July 6 interview, law enforcement's suspicions are irrelevant if those suspicions are not disclosed to the defendant. See *State v. Heath*, 264 Kan. 557, 590, 957 P.2d 449 (1998).

We conclude as a matter of law based upon the evidence before the district court that the defendant was not in custody on June 27 or July 6. "More specifically, the facts cited above support the legal conclusion that a reasonable person would not have believed he was in custody." See *James*, 276 Kan. at 753.

The district court did not err in admitting evidence of these interviews.

Issue 5: *Did the district court err by failing to give jury instructions for the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter?*

Torres contends that the district court erred by failing to instruct for certain felony-murder lesser included offenses, *i.e.*, reckless second-degree murder, and reckless involuntary manslaughter. Torres did not request such instructions. Accordingly, our standard of review is whether failing to give the instructions was clearly erroneous. Since its 1998 amendment, K.S.A. 22-3414(3) has been clear that this standard includes lesser included offenses:

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous." K.S.A. 2004 Supp. 22-3414(3).

Our case law also provides that when dealing with the particular scenario involving felony murder, instructions on lesser included offenses are not required unless the evidence of the underlying felony is weak, inconclusive, or conflicting. *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 (2001).

At least one of our decisions has applied both the test from *Branning* and the test from K.S.A. 2004 Supp. 22-3414(3) as alternative bases for analyzing and eventually denying the defendant's argument. See *State v. Calvin*, 279 Kan. 193, 201, 105 P.3d 710 (2005). In the instant case, where Torres admitted to law enforcement and Tianna's mother that he shook and threw Tianna, we simply hold that the instructions are not clearly erroneous because we are not firmly convinced that there is a real possibility the jury would have returned a different verdict if the trial error had not occurred. See *State v. Lowe*, 276 Kan. 957, 963, 80 P.3d 1156 (2003). The *Branning* analysis is unnecessary when the lesser included instructions have not been requested.

Issue 6: *Did the district court err in admitting certain photographs?*

Torres argues that the district court erred in admitting certain photographs which he claims are gruesome, cumulative, and lacked

probative value. At trial, Torres objected only to two of these photographs, State's Exhibits 22 and 31.

The standard of review for the admission of these photographs requires us to first determine whether they are relevant, *i.e.*, probative. *See State v. Kirby,* 272 Kan. 1170,1186-88, 39 P.3d 1 (2002); *State v. Ruebke,* 240 Kan. 493, 517, 731 P.2d 842 (1987) (Photographs and videotape of homicide victims "had a reasonable tendency to prove or disprove a material fact in issue, or shed light upon a material fact.").

State's Exhibit 22 is a photograph of Tianna's full body clothed in a diaper, laying on a white sheet prior to the autopsy. The photograph shows a brain pressure monitor attached to Tianna's head, an endotracheal tube, a gastric tube, needle puncture marks, and various catheters. State's Exhibit 31 is a photograph taken during the autopsy showing Tianna's scalp reflected forward and backward. None of Tianna's facial features or other body parts are visible in the photograph. Dr. Dudley explained that Exhibit 31 showed a large area of hemorrhage under the scalp and on the bone, indicating a deeper injury than just a surface bruise.

The two photographs were used to either prove the manner of death, or to explain medical testimony, or both. They are relevant and admissible. See *State v. Bell,* 273 Kan. 49, 52-53, 41 P.3d 783 (2002) (Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible.); *State v. Deal,* 271 Kan. 483, 493, 23 P.3d 840 (2001) (Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible, including photographs which aid a pathologist in explaining the cause of death.).

Torres also argues that the photographs are cumulative and overly gruesome, *i.e.*, prejudicial. Our standard of review of these claims is abuse of discretion. *State v. Parker,* 277 Kan. 838, 847, 89 P.3d 622 (2004) (An abuse of discretion has occurred when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice.). The admission of photographs in a murder case has rarely been held to be an abuse of discretion. *State v. Deal,* 271 Kan. at 493.

We have reviewed the two photographs and find no abuse of discretion in their admission into evidence.

As to the other photographs, no objection was made at trial to their admission. As such, the issue of their admission was not preserved on appeal. K.S.A. 60-404; *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001).

**Issue 7:** *Did the district court err in denying a motion for mistrial based upon allegations of prosecutorial misconduct?*

Torres next claims that the district court erred in denying his motion for mistrial based upon an accusation of prosecutorial misconduct for tampering with witness Susan Rodriguez. Denials of motions for mistrial are reviewed for abuse of discretion. *State v. Daniels*, 278 Kan. 53, 66, 91 P.3d 1147 (2004). The burden of proof is on the party alleging the discretion is abused. *State v. Horn*, 278 Kan. 24, Syl. ¶ 5, 91 P.3d 517 (2004).

Torres' attorney, Lucille Douglass, spoke with the district court about possible threats made to Susan by the prosecutor, Wade Dixon. During the trial, Torres' attorney came into contact with Susan Rodriguez at Teresa Torres' house. The attorney asked Susan how she was doing. Susan said in a very angry outburst, "I'm tired of courts, I'm tired of being here, I'm tired of not being able to talk to Abel. And you got me subpoenaed so I have to do it again." Susan said, "[T]hey told me it was up to me to send Abel, that if I didn't say what they wanted they would take my baby away and send my sister to prison. . . . [T]hat's why I testified differently this time [at the trial as opposed to the preliminary hearing]." Torres' attorney said that Susan identified the prosecutor as the person making the threat.

Torres requested a mistrial based on this information. The district court raised the possibility of bringing Susan to court, putting her under oath, and hearing what she said. Torres' attorney did not believe Susan would say anything with the prosecutor there, out of fear that her son would be taken away and her sister sent to prison if she did not testify the way the State wanted her to testify.

The prosecutor told the court that he believed the perceived threats were from a conversation he had with Susan where he told

her that it would be difficult to convince the jury that what the State alleged against Abel was true unless Susan believed that it was true, and he needed to know whether Susan believed it was true.

The court took a recess to consider the issue, and then stated:

"I had a chance to think about the allegations that Ms. Rodriguez has told Ms. Douglass about, and it appears to me that if Ms. Douglass has Ms. Rodriguez under subpoena, she can ask her any question she wants as long as it is relevant to the case. And the conversation that Ms. Rodriguez had with Miss Douglass would certainly be relevant with regard to the facts of the case. I don't think it's a mistrial situation as much as it is the credibility of a witness, so the motion for a mistrial is denied."

The court also allowed a social worker to contact Susan about her rights as a parent, though it is not clear from the record whether the social worker was located or spoke to Susan.

At trial, the defense called Susan Rodriguez as a witness and addressed her testimony given at the preliminary hearing:

"Q. You testified on Tuesday [during the State's case-in-chief] that Abel — that your impression was that Abel violently shook the child. Do you remember that?
"A. Yes, out of frustration.
"Q. Was that testimony different from the way you testified to previously?
"A. Not really. I just didn't use more direct —direct answer to your questions.
"Q. Susan, were you worried about testifying?
"A. Yes.
"Q. Did you feel like you were placing your sister or your daughter in danger — I'm sorry, your sister or your son in danger?
"A. My son.
"Q. And why did you feel like you were placing your son in danger?
"A. Because he's all I have.
"Q. Okay. Did you think — did that have any impact on how you testified?
"A. I would say it was questioned, but no.
"Q. Were you afraid that something would happen to your son because of your testimony?
"A. No.
"Q. Do you remember talking to me last night?
"A. Yes.
"Q. Do you remember what you told me last night?
"A. Yes.
"Q. Is what you are saying here today the same thing you told me last night?

"A. I'm concerned is what I remember talking with you about.
"Q. You're concerned about what you are talking to me about?
"A. No, I'm concerned for my son.
"Q. You're concerned for your son?
"A. Yes."

The defense had no further questions for Susan.

After the jury had returned a guilty verdict, Torres moved for a new trial based on the district court's failure to conduct a hearing on whether improper prosecutorial statements had been made to Susan Rodriguez and if such statements had anything to do with her testimony at trial. The court denied the motion, stating:

"The trial lasted about a week. And the defense team had subpoenaed the witness in question, Susan Rodriguez, to testify on their behalf after she had testified on behalf of the State.

"I can't remember exactly when it was in the trial, but I think it was after the State rested, that Ms. Douglass, one of the defense team attorneys, came to us and asked that we have an in camera session with regard to some statements that had been made to her and, as I recall, in the presence of other people the night before the defense was to put on their case.

"And my recollection is that Ms. Douglass said that Ms. Rodriguez came to where she was and that she was hysterical. That she made statements that . . . indicated to Ms. Douglass that she had been threatened by Mr. Dixon that her children would be removed from her if she . . . did not testify the way that Mr. Dixon had told her to testify.

"[A]t any time during the trial, especially during a week-long trial, the parties have an opportunity to interview any witnesses they choose to interview, if those witnesses will allow themselves to be interviewed. And that is essentially what happened in this case.

"The Court decided at that time that an in camera examination, and I don't recall if I was asked or not, but if I had been asked I would have decided that an in camera examination of a current witness would have been inappropriate since the defense team had an opportunity to visit with that witness on the stand in open court. And that's exactly what happened.

"As I recall, the subject of that evening conversation was brought up when Mrs. Rodriguez was on the stand. It wasn't pursued particularly hard because Mrs. Rodriguez at the time denied that any threats had been made to her, or that she had had that conversation with Ms. Douglass.

"I suppose . . . in retrospect that Ms. Douglass could have called whatever witnesses were present at the time those statements had been made, and she chose not to do so. The subject wasn't pursued particularly hard. Certainly had Ms. Douglass asked for Ms. Rodriguez to be deemed a hostile witness, the Court probably would have done so.

"I can assure you that had Ms. Rodriguez testified the same way that Ms. Douglass thought she was going to testify, the Court would have taken serious steps to investigate the matter with regard to prosecutorial misconduct.

"But other than Ms. Douglass's statements, there was nothing from the stand under oath that would lead the Court to believe that any misconduct had taken place. Or that the testimony of Ms. Rodriguez was perjured in any way."

Torres fails to cite to any relevant legal authority showing that the district court had a duty to do anything beyond what it did. We have held that " '[s]imply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority or in the face of contrary authority, is akin to failing to brief an issue. "Where the appellant fails to brief an issue, that issue is waived or abandoned." ' " *Mid-Continent Specialists, Inc., v. Capital Homes,* 279 Kan. 178, 191, 106 P.3d 483 (2005). As such, Torres fails to show that the district court abused its discretion in denying the motion for a mistrial or in not conducting either an in camera meeting or an evidentiary hearing on the allegations of prosecutorial misconduct.

Issue 8: *Did the district court err in allowing the jury to see demonstrative illustrations on "shaken impact" and "shaken baby" syndrome?*

Torres next complains the district court erred in allowing six medical illustrations as demonstrative evidence. His counsel timely objected to these illustrations at trial. The district court ruled that they could be used to help explain testimony, but they would not be admitted into evidence.

Dr. Dudley then explained the illustrations. She testified that the illustrations were from textbooks and were artistic renditions showing what occurs with the mechanism of shaken baby, the blood supply over the surface of the brain, the layers of the brain, the locations where fluid would collect between the layers of the brain with these injuries, and the inside of the eye with retinal hemorrhages. She stated, "So this will help me to explain to you the mechanism of what happens with shaken baby and shaken impact syndrome, and also the layers that are involved when I then show you the actual photographs that were taken at autopsy of

where this injury has occurred in the brain." She also testified that they are a fair and accurate representation of what is typically or normally found in examination of the human body.

In *Van Welden v. Ramsay's Inc.*, 199 Kan. 417, 430 P.2d 298 (1967), this court affirmed the admission of four sketches of a thoracic vertebra introduced through the plaintiff's physician and surgeon. This court stated:

"We see no error in allowing the physician to use sketches of the thoracic vertebra to illustrate appellee's injury where they accurately portrayed that which was competent to describe in words. We see no reason to distinguish between medical illustrations, and charts and drawings to establish other physical facts. If the sketch be a substantially correct reproduction of the injured part of the anatomy it should be admissible within the trial court's discretion. The physician testified:

"'. . . I compared the x-rays and the sketches and they do correspond to the illustrations as shown in the x-ray.'" 199 Kan. at 419.

The same can be said of the six illustrations here. Although they were not illustrations specifically of Tianna, they were fair and accurate representations of the human body. Because the doctor used the illustrations in conjunction with actual photographs of Tianna's brain to show where the injury occurred, they were useful to explain Dr. Dudley's medical testimony regarding shaken baby and shaken impact syndrome.

Because the *Van Welden* court concluded no error was made in the admission of the demonstrative evidence, *a fortiorari* we conclude the mere use of the demonstrative evidence in the instant case was not error. See *Nelson v. Hardesty,* 205 Kan. 112, 116, 468 P.2d 173 (1970) (use of drawings shown to be reasonably accurate are acceptable to aiding a jury to visualize objects relevant to the action); see also *State v. Hood,* 18 Kan. App. 2d 1, 3, 846 P.2d 255 (1993) (approving use of anatomically correct doll as aid to jury in trial of sex crimes of young victims).

Issue 9: *Did the district court err in allowing the State to call six expert witnesses?*

Torres contends the district court erred in allowing the State to call six expert witnesses while he only had one. He argues that the sheer number of the State's witnesses overpowered his. At trial,

however, he only objected to Dr. Melhorn's testimony as cumulative, and the district court overruled the objection.

Without Torres' objection at the district court to five of the experts, he has failed to preserve the issue for appeal. K.S.A. 60-404; See *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001).

As for Dr. Melhorn, whether otherwise relevant evidence is cumulative is a matter of discretion for the trial court. *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001). The burden of proof is on the party alleging the discretion is abused. *State v. Horn*, 278 Kan. 24, Syl. ¶ 5, 91 P.3d 517 (2004).

Several medical personnel testified at trial. Dr. David Thetford was the physician who treated Tianna at the Wichita County Hospital in Leoti. Dr. Liong is the radiologist at St. Catherine's Hospital. Dr. James Zauche is a pediatrician who treated Tianna in Garden City. Dr. Lindall Smith treated Tianna at the intensive care unit at Wesley Medical Center in Wichita. Dr. Debra Desilet-Dobbs is a pediatric radiologist who testified about the films taken at Wesley Medical Center. Dr. Mary Dudley performed the autopsy on Tianna. Each of these medical personnel performed separate medical procedures on Tianna and had first-hand diagnostic knowledge of her injuries. Many of them, as part of Tianna's treatment, formed medical opinions as to the cause of Tianna's injuries.

Dr. Katherine Melhorn is a pediatrician and faculty member at the University of Kansas School of Medicine in Wichita and was consulted as a physician on the care team when Tianna was admitted to Wesley Medical Center. She interviewed Susan and examined Tianna. Her testimony corroborated the other medical testimony regarding Tianna's injuries, particularly the retinal hemorrhages. The admission of this testimony, while cumulative in part, was not an abuse of the trial court's discretion.

Issue 10: *Did the district court err by failing to exclude part of the testimony of Dr. Mary Dudley and thereby violate Torres' constitutional right to a fair trial?*

Torres also claims the district court erred by allowing Dr. Dudley to testify in rebuttal to defense expert Dr. Gilmartin that Tianna's death was a homicide and that her death was a case ex-

ample for shaken baby or shaken impact syndrome. He alleges this violated his constitutional right to a fair trial.

We have defined our standard as follows:

"Under the federal constitutional error rule, an error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. McClanahan*, 259 Kan. 86, Syl. ¶ 4, 910 P.2d 193 (1996)." *State v. Smallwood*, 264 Kan. 69, 81, 955 P.2d 1209 (1998).

As we stated in *State v. Struzik*, 269 Kan. 95, 99, 5 P.3d 502 (2000):

"Although an expert may give an opinion on an ultimate issue as provided in K.S.A. 60-456(d), such witness may do so only insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material in evidence. An expert witness may not pass on the weight or credibility of evidence, for those matters are strictly within the province of the jury."

Torres specifically contends that several of Dr. Dudley's statements went to the weight and credibility of the evidence, thereby invading the province of the jury.

First, Dr. Dudley testified, "And the cause of death is listed as shaken impact syndrome, and the manner of death is homicide." This court has held that an expert's testimony that a child died as a result of child abuse did not invade the province of the jury, when the expert does not testify as to the ultimate question of the defendant's guilt or innocence. See *State v. Struzik*, 269 Kan. at 101; *State v. Smallwood*, 264 Kan. at 81. Similarly, opining that death was caused by shaken impact syndrome, a type of child abuse, does not invade the jury's province. Moreover, describing Tianna's manner of death as "homicide" — defined in Black's Law Dictionary 751 (8th ed. 2004) simply as "[t]he killing of a person by another" — does not expand our approved descriptions in *Struzik* and *Smallwood* that a child died as a result of abuse because that clearly implies death at the hands of another. Dr. Dudley's statement did not go to the ultimate question of Torres' guilt or innocence.

Second, Dr. Dudley testified:

"Well, basically this is my diagnosis, you know, my training and experience in this field of forensic pathology, with a specialty in child abuse cases and a special interest in shaken baby syndrome, really *makes this a textbook case.* This has every feature of a shaken impact syndrome including the impact site of the head injury with the fracture. It has the bruises that the child had, the linear skull fracture showing the impact, the separation of the sutures in the brain showing that there was swelling so severe that the brain caused the sutures to separate again, the extreme brain swelling with herniation, the bilateral retinal and optic nerve sheath hemorrhages, the posterior rib fractures, the severe injury to the brain.

"Everything — *if I had to pick out a case example for shaken baby or shaken impact syndrome, it would be this case.* And my diagnosis is shaken impact syndrome, which I made at the time I did the autopsy, and it stands to be that today." (Emphasis added.)

Although Torres focuses only on the last paragraph, the entire passage shows that Dr. Dudley based her conclusion on specific medical findings. Her training and experience in the field of child abuse and shaken baby syndrome qualify her to make such findings and conclusion. Additionally, she already had testified that the cause of death was shaken impact syndrome. Her opining that the death was a "textbook case" or "case example" for shaken impact or shaken impact syndrome merely reinforced her testimony rebutting the defense expert Dr. Gilmartin who testified there was no evidence Tianna had been shaken. Her testimony did not go to the ultimate question of Torres' guilt or innocence.

Even if the testimony was inadmissible, the error did not rise to the level of denying Torres' constitutional right to a fair trial. It had little, if any, likelihood of having changed the result of the trial given the large amount of evidence supporting the State's case. See *State v. Smallwood,* 264 Kan. at 80-81.

Issue 11: *Did the cumulative effect of any errors deprive Torres of his right to a fair trial?*

Finally, Torres argues that the cumulative effect of the errors deprived him of his right to a fair trial. Having reviewed the 10 previous issues, and finding no error, it follows that there is no cumulative error. See *State v. Parker,* 277 Kan. 838, 848, 89 P.3d 622 (2004).

Affirmed.

GERNON, J., not participating.

LARSON, S.J., assigned.