No. 118,695

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARK ANTHONY BAKER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

The State waives the ability to raise a statute of limitations defense to a K.S.A. 60-1507 motion in the appellate court if it did not raise that defense in the trial court.

2.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. To show a violation, the defendant must meet the two-part test set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984): that the attorney's conduct fell below an objective standard of reasonableness and that the attorney's inadequate conduct prejudiced the defendant.

3.

Prejudice is shown if there is a reasonable probability that the proceeding's outcome would have been different had the representation been adequate. A reasonable probability is one sufficient to undermine confidence in the outcome.

1

4.

To determine *Strickland* prejudice in cases alleging a failure to present mitigation for purposes of sentencing, the court must reweigh the evidence in aggravation against the totality of available mitigating evidence.

5.

In this case, where the aggravating circumstances greatly outweigh the mitigating circumstances, defendant fails to show the attorney's representation prejudiced him, even though the defendant's attorney offered no mitigating evidence at sentencing.

Appeal from Labette District Court; JEFFRY L. JACK, judge. Opinion filed December 20, 2019. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Stephen P. Jones*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., MALONE and GARDNER, JJ.

GARDNER, J.:  Mark Anthony Baker repeatedly abused and then murdered a 19-month-old infant who was in his care. He pled guilty to felony murder, child abuse, possession of marijuana, and obstruction of official duty. The Kansas Supreme Court affirmed his convictions and sentence on appeal. *State v. Baker*, 297 Kan. 482, 301 P.3d 706 (2013). Baker then moved for relief under K.S.A. 60-1507, alleging that his counsel was constitutionally ineffective at sentencing for not presenting any mitigating evidence of his mental health. After an evidentiary hearing, the district court found that Baker suffered no prejudice from any deficient performance by counsel at sentencing. We agree. Given the overwhelming aggravating factors, we find no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, thus, the sentence imposed.

2

Baker has not met his burden to show a reasonable probability that, but for counsel's deficient performance, he would have received a lesser sentence.

FACTUAL AND PROCEDURAL BACKGROUND

In 2011, Baker pleaded guilty to felony murder, child abuse, possession of marijuana, and obstruction of official duty. As part of the plea agreement, Baker reserved the right to argue for concurrent sentences and the State reserved the right to argue for consecutive sentences.

*Baker's sentencing hearing*

At sentencing, Baker agreed his criminal history score was a B. The sentencing court, Judge Robert Fleming, heard testimony from the victim's family. The State asked to present evidence regarding the extent of the victim's injuries. Baker's appointed counsel, Samuel Marsh, stated he did not think that was necessary because the State could have had a preliminary hearing if it so desired. Marsh also submitted a brief arguing against double jeopardy for the felony murder and child abuse crimes. Marsh stated:

> "I'm trying to raise those issues, Judge, because hopefully I want to get this right. Obviously, this is a life sentence. He's going to go to prison for life.
>    "I think the issue here is whether you run these sentences consecutively or concurrently, and ultimately that's your decision. And I've raised the issues. The State's raised the issues. I think it's up to you to make the decision."

Judge Fleming then heard testimony from the pathologist in which he recounted his findings from the autopsy. The pathologist concluded the child died from trauma to his head and abdomen. The pathologist testified the injuries to the child were done with a lot of energy and force. Marsh had no questions for this witness and stated he had no

3

further evidence he wished to present. When Judge Fleming asked for Baker's statement or whether he had any mitigating evidence, Baker replied that he was sorry because nothing would heal the family's pain. Baker did not mention any mental health issues.

Judge Fleming sentenced Baker to life imprisonment on the murder count, 128 months in prison on the child abuse count, 12 months in prison on the marijuana possession count, and 7 months in prison for the obstruction of official duty count. The sentence for felony murder, an "off-grid crime," was life in prison with parole eligibility after serving 20 years (with no deductions for good-time credits). See K.S.A. 21-3401; K.S.A. 21-4706(c); and K.S.A. 2010 Supp. 22-3717(b)(2). The other three crimes had presumptive sentences under the guidelines, which provide three potential sentences based on the severity level of the crime and the defendant's criminal-history score. Judge Fleming imposed the aggravated sentences for each crime and ordered them to run consecutive. This meant that Baker would first serve the 20-year minimum sentence for felony murder and then serve up to another 147 months.

In ruling, Judge Fleming stated: "[F]rankly, to take out your frustrations on an innocent baby . . . I consider to be the most cowardly, egregious, disgusting kind of conduct I can imagine. And I think it certainly merits a sentence for abuse of a child in the aggravated range in the grid box." At other times in the sentencing hearing, the sentencing court stated it was not inclined to look for equity for Baker. And it concluded the hearing by stating: "Well, as I said before, notwithstanding [defense counsel's] comments about consecutive sentences lacking equity or being fundamentally unfair, Mr. Baker is entitled to due process. He's had it. He's pled guilty. I'm not inclined to be charitable toward him."

*Baker's 60-1507 motions*

Baker timely filed the K.S.A. 60-1507 motion he now appeals. It alleges: (1) the district court abused its discretion in sentencing Baker by denying his request to run the sentences concurrent and (2) he received ineffective assistance of counsel because his attorney "promised that the plea would be granted" yet he did not end up receiving a concurrent sentence. Baker claimed the concurrent sentences agreement was the reason he agreed to enter the plea and he believed the plea bargain would be honored. Baker further stated that he did not raise this argument in his direct appeal because his appellate attorney had not consulted him before filing it.

Baker later filed three amended 60-1507 motions. In the first, filed in December 2014, Baker again argued ineffective assistance of counsel regarding his ability to request concurrent sentences. Baker argued that the written plea agreement was ambiguous, that he did not understand the State was free to argue in favor of consecutive sentences, and that he did not understand the court could order a sentence different than agreed to in the plea agreement. In August 2015, Baker filed a second amended motion. This motion added another ineffective assistance of counsel claim, alleging his trial counsel failed to investigate Baker's mental health history and failed to offer mitigating evidence of mental illness and traumatic childhood events. Baker's third amended motion, filed in February 2017, included the same arguments but focused mostly on counsel's failure to investigate and failure to present mitigating evidence.

*The evidentiary hearing on Baker's 60-1507 motions*

A different judge, Judge Jeffry Jack, conducted the evidentiary hearing on Baker's K.S.A. 60-1507 motion. Marsh agreed that he could have put on mitigating evidence at Baker's sentencing hearing. Marsh stated whether the sentences were run consecutive or concurrent was ultimately up to the district court's discretion. Marsh admitted he was

5

aware of Baker's mental health issues, as he had discussed Baker's mental health issues with Baker, but he never had Baker's mental health evaluated. Marsh was initially concerned about Baker's competency to stand trial, but he thought Baker seemed competent. Marsh considered presenting Baker's mental health issues to the sentencing court as mitigating evidence but decided not to do so. His reason was based on his long, personal experience with the sentencing judge:

> "[M]y experience appearing before Judge Fleming, especially in child cases, was that we were probably better off going in and taking responsibility for our actions, hoping that these would be consecutive, rather than going in and trying to mitigate through psychological mumbo-jumbo, for lack of a better term."

Marsh had met Baker's family members before sentencing but did not ask any of them to testify on Baker's behalf at the sentencing hearing. Marsh stated: "You know, I don't recall talking to anyone. We knew he was going to get a life sentence. There had been some changes in the plea . . . I don't specifically remember talking to them about testifying."

When asked whether Marsh was satisfied with the plea agreement, he testified:

> "I mean, obviously, if you get a person a life sentence, that's not a great agreement, but I was [satisfied] in this case. He was charged with . . . murder. He was charged with a[n] aggravated sodomy charge. If that could have resulted in the death penalty upon those convictions. The sentence for murder could have been a hard 50. The sentence for aggravated sodomy could have been life without eligibility for parole. . . . His ultimate sentence was life. Eligibility for parole after 20. The agg[ravated] sodomy went away. So therefore, the death penalty went away. While I wouldn't say that I was completely satisfied. I wish we could have got the sentences concurrently. But we made a lot of very serious charges and serious consequences go away."

Marsh felt that the longer the case went on, the greater the chances were for the death penalty. Marsh had negotiated other plea agreements with the State, but the State rejected them. Marsh stated there could be a sufficient factual basis for the murder charge, but his and Baker's main goal was to make the aggravated sodomy charge go away. Because Baker had previous aggravated indecent liberty convictions that could have been presented to the jury, Marsh believed a jury would have convicted Baker on the current sodomy charge had it not been dismissed due to Baker's plea. Marsh discussed all the options with Baker and Baker accepted the plea. The plea dismissed the aggravated sodomy charge and thus took the death penalty off the table. The plea preserved Baker's ability to argue for concurrent sentences.

A mental health professional, Dr. Jon Sward, also testified as an expert witness. Sward testified that the purpose of a mental health evaluation is to do a comprehensive evaluation of a person's mental, emotional, behavioral, functional, and personality makeup and then recommend treatment plans for each person. Sward testified that Baker's medical records showed previous methamphetamine use, a diagnoses of post-traumatic stress disorder (PTSD), cannabis use disorder, an adjustment disorder with a depressive reaction, and an unspecified personality disorder.

Sward also interviewed Baker in person. Sward learned that Baker had a difficult childhood comprised of his mother abandoning him, sexual abuse, a physically abusive father and stepmother, and substance abuse that started at an early age. Sward estimated Baker's intellectual functioning was "low normal to maybe slightly below normal." Baker also had psychiatric problems that started in his childhood such as attention deficit hyperactivity disorder, dyslexia, bipolar disorder, and oppositional defiant disorder.

Baker told Sward he had found his mother's body after she committed suicide and this caused nightmares and frequent intrusive memories. Sward found this supported a PTSD diagnosis. Tests also indicated Baker might have some neurological problems and

7

behavioral dysfunction, would likely have difficulty in forming close relationships, and would tend to be emotionally restricted. Sward testified that those who were abused as a child also become abusers themselves, not necessarily because of intent, but as more of "a si[de] effect." Ultimately, Sward concluded Baker had complex PTSD at the time he committed his crimes.

Baker's sister testified that Baker told her he feels remorse for his actions and she would have been willing to testify to his good character at this sentencing hearing had she been asked. Baker's grandmother and father would have also testified to Baker's good character if asked. Baker testified that he spent time in and out of juvenile facilities and at mental hospitals throughout his life. Baker stated Marsh would have had access to this history as far as he was aware.

Carl Folsom, a criminal defense lawyer, also testified as an expert witness. Folsom stated he tries to put on mitigating evidence at every sentencing hearing no matter what the offense is. Folsom testified:  "If it's a contested hearing, . . . I think that there is some duty to present mitigating evidence to balance the aggravating evidence." Folsom stated: "Otherwise, you're, the defense lawyer is abandoning the rule of advocate in that situation." Folsom testified evidence that mitigates one's culpability or explains events or circumstances leading up to a certain offense are particularly powerful.

With respect to Baker's case, because Baker received the aggravated number for each offense, Folsom would have argued for a standard or mitigated sentence "or maybe argue that one of the counts should be [run] concurrently with the first degree murder." Folsom stated the mitigating evidence could have helped the district court give Baker something other than the worst possible sentence on every count. Folsom opined that Marsh should have reasoned there was some sort of mental illness going on and should have immediately had Baker evaluated. Folsom did not think Marsh's failure to present any mitigating evidence could be seen as a strategic decision. Folsom concluded Marsh's

8

representation fell below the objective standard of reasonableness because "powerful" mitigating evidence existed of Baker's mental illness yet it was not investigated or presented to the district court.

*Judge Jack's ruling*

In ruling, Judge Jack cited the appropriate standard to determine whether Marsh was ineffective was the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires Baker to show:  (1) that Marsh's conduct fell below an objective standard of reasonableness; and (2) to show prejudice—a reasonable probability that, but for counsel's deficient performance, the outcome of his sentencing proceeding would have been different. 466 U.S. at 687.

As to Marsh's conduct, Judge Jack held the evidence presented a very close question. Although Marsh probably should have investigated Baker's mental health, he was unsure whether Marsh was required to investigate further. Judge Jack stated that Marsh's decision was tactical and he had a reason for doing what he did:  "It wasn't a fanciful or crazy reason, but he based it on his 20 years of experience as a criminal defense lawyer" in Kansas, on the facts of this case, and on his knowledge of the particular judge he was appearing in front of. Judge Jack stated there is more to sentencing than just aggravating and mitigating factors—a court also considers the number, severity, and type of crime; chances of rehabilitation; dangers to the community; and the court's own observations of the defendant. Judge Jack held that Marsh had taken all of those factors into account in making his decisions. Ultimately, Judge Jack did not definitively rule on whether Marsh's performance was deficient under the first *Strickland* prong.

Instead, Judge Jack found no prejudice. He did not think it was probable that Judge Fleming would have made a different decision or that there would have been a

9

different outcome even if Marsh had presented mitigating mental health evidence. He found the aggravating factors would have likely outweighed the mitigating factors and Baker would still have received consecutive sentences. Having heard all the mitigating evidence, Judge Jack did not think testimony from Baker's family that he was a good grandson would have changed Judge Flemings's opinion of Baker's crimes. And if Baker's sister had been called to testify to his good character, she would likely have testified on cross-examination that Baker had sexually abused her, which may have aggravated the situation.

Judge Jack specifically addressed the expert testimony about Baker's mental health. He stated Baker's PTSD arose from two events—his mother's death and the events of these crimes—yet Baker had committed serious crimes before he found his mother's body and before he committed these crimes. Judge Jack noted the uncontested evidence that Baker had committed crimes against this child repeatedly, not just on the one date he was convicted of. Baker committed a series of brutal events and had tried to hide his crimes from police. Judge Jack did not think the sentencing court would have credited Baker's PTSD evidence—instead, presenting that evidence may have increased the sentence if that had been an option. Judge Jack stated that he would have given Baker the same sentences that Judge Fleming gave him.

Judge Jack concluded that Baker failed to show prejudice, so he denied his motion. Baker filed a timely notice of appeal.

I. IS BAKER'S AMENDED K.S.A. 60-1507 MOTION TIMELY?

We first address the State's argument that Baker's three amended K.S.A. 60-1507 motions are untimely. The State contends the amended motions were not filed within the one-year statutory limitation and do not relate back to the date of Baker's original timely motion because they substantially changed the arguments and claims Baker made in the

10

original motion. See *Pabst v. State*, 287 Kan. 1, Syl. ¶ 7, 192 P.3d 630 (2008) (finding that an amendment to a K.S.A. 60-1507 motion that asserts a new ground for relief which is supported by facts that differ in both time and type from the grounds set forth in the original motion does not relate back to the date of the original motion, so as to circumvent the one-year limitation of K.S.A. 60-1507[f][1]).

Judge Jack did not address this timeliness issue, apparently because the State did not raise it below. We find no citation to the record presenting this defense. By not raising the defense of untimeliness to the district court, the State waived that defense on appeal, as we have previously held:

> "Proceedings under K.S.A. 60-1507 are civil in nature and are governed by the rules of civil procedure. *Smith v. State*, 22 Kan. App. 2d 922, 923, 924 P.2d 662 (1996). The bar of a statute of limitations is not a jurisdictional bar, but rather an affirmative defense which must be pled. K.S.A. 2017 Supp. 60-208(c)(1)(P). A party may waive the statute of limitations defense, and the district court may proceed to hear and decide the case. *Diversified Financial Planners, Inc. v. Maderak*, 248 Kan. 946, 948, 811 P.2d 1237 (1991). If a party fails to properly assert an affirmative defense before the district court, it waives the defense on appeal. 248 Kan. at 948.

> "K.S.A. 2017 Supp. 60-1507(f) is comparable to a statute of limitations. See *Morningstar v. State*, No. 116,857, 2018 WL 297336, at *2 (Kan. App. 2018) (unpublished opinion) (calling K.S.A. 2017 Supp. 60-1507[f] a statute of limitations); *Bradford v. State*, No. 117,354, 2017 WL 6062089, at *1 (Kan. App. 2017) (unpublished opinion) (calling K.S.A. 2016 Supp. 60-1507[f] a statute of limitations). Our statutes of limitation, when read together, do not impose an absolute, unconditional time bar to a civil action. They permit the tolling of the limitation period during the disability of the plaintiff (K.S.A. 60-508 and 60-515) or when the defendant has absconded, has concealed himself or herself, or has departed the state (K.S.A. 60-517). Similarly, the one-year time limitation of K.S.A. 2017 Supp. 60-1507(f) may be extended to prevent manifest injustice. Thus, the running of the one-year period in K.S.A. 2017 Supp. 60-1507(f) does not provide a jurisdictional bar that prevents the court from hearing the

11

motion. Because the one-year time limit in K.S.A. 2017 Supp. 60-1507(f) is not

jurisdictional, it may be waived if not asserted." *Lewis v. State*, No. 117,985, 2018 WL

4038981, at *2 (Kan. App. 2018) (unpublished opinion).

We believe this reasoning is sound and we adopt it here. The State waived the time limit

of K.S.A. 2018 Supp. 60-1507(f)(1) by not asserting it earlier. We thus consider all of

Baker's motions to be timely.


II.     DID THE DISTRICT COURT ERR IN DENYING BAKER'S K.S.A. 60-1507 MOTION?


We next address the substance of Baker's claim that the district court erred in

denying his K.S.A. 60-1507 motion. Because the district court held an evidentiary

hearing on Baker's K.S.A. 60-1507 motion, we review its factual findings for substantial

competent evidence and evaluate whether those findings support the trial judge's

conclusions of law. We review the district court's legal conclusions de novo. *Thompson v.

State*, 293 Kan. 704, 715-16, 270 P.3d 1089 (2011).


*The* Strickland *standard*


The Sixth Amendment to the United States Constitution guarantees a criminal

defendant the right to effective assistance of counsel. To prevail on a claim of ineffective

assistance of counsel, a criminal defendant must establish:  (1) counsel's performance was

deficient under the totality of the circumstances, and (2) prejudice, meaning that it is

reasonably probable that the jury would have reached a different result absent the

deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014)

(relying on *Strickland*, 466 U.S. at 687).


A reviewing court may first consider the prejudice prong of an ineffective

assistance of counsel claim by assuming trial counsel's alleged errors amounted to

12

deficient performance. *Edgar v. State*, 294 Kan. 828, 843, 283 P.3d 152 (2012) (quoting *Strickland*, 466 U.S. at 697). We do so here, as did the district court. We note that even in a death penalty case, the decision not to present mitigation may be supported in certain cases by "strategic judgments," provided the reviewing court is satisfied with "the adequacy of the investigations supporting those judgments." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). Perhaps that is the case here. Yet Marsh's decision not to present any "psychological mumbo-jumbo" may not have been reasonable merely because he believed Judge Fleming was the type of judge who wanted defendants to accept responsibility for child crimes. Presenting evidence of Baker's mental health issues as a mitigating sentencing factor would not have precluded Baker from accepting responsibility for his crimes. For purposes of expediency we assume, without deciding, that Marsh's performance was deficient under the totality of the circumstances.

We thus focus our analysis on whether Baker has shown prejudice. Baker has the burden to show prejudice—none is presumed. See *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015); *State v. Kettler*, 299 Kan. 448, 465, 325 P.3d 1075 (2014). "The challenged aspects of counsel's performance—failing to adduce mitigating evidence and waiving closing argument—are plainly of the same ilk as other specific attorney errors subject to *Strickland's* performance and prejudice components. See, e.g., *Darden v. Wainwright,* 477 U.S. 168, 184, 106 S. Ct. 2464, 91 L. Ed. 2d 144." *Bell v. Cone*, 535 U.S. 685, 686, 122 S. Ct. 1843, 1846, 152 L. Ed. 2d 914 (2002).

The ultimate focus of the *Strickland* test is centered on fairness and is used to determine whether the result of a particular proceeding is unreliable because of a breakdown in the adversarial process. *Strickland*, 466 U.S. at 696. Baker must show that counsel's errors were so serious that they deprived him of a fair sentencing proceeding. See *State v. Hedges*, 269 Kan. 895, 913, 8 P.3d 1259 (2000).

13

Baker must show a reasonable probability that, but for counsel's deficient performance, the outcome of the sentencing proceeding would have been different. *Sprague*, 303 Kan. at 426. A reasonable probability is a probability sufficient to undermine confidence in the outcome of those proceedings. *State v. DeWeese*, 305 Kan. 699, 710, 387 P.3d 809 (2017). The reasonable probability test asks whether the newly disclosed evidence puts the whole case in such a different light as to undermine confidence in the result. *State v. Moore*, 302 Kan. 685, 701, 357 P.3d 275 (2015) (quoting *State v. Warrior*, 294 Kan. 484, 511, 277 P.3d 1111 [2012]).

*Judge Jack's application of the* Strickland *standard*

The record shows that Judge Jack may not have properly applied this test here. He correctly stated the *Strickland* test, yet he required Baker to show that it was "more likely than not" that the sentencing judge would have made a different decision had the mitigating evidence been presented. But *Strickland* makes clear that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." 466 U.S. at 693. Instead, the reasonable probability standard is a lesser standard— that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687. But it "is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." 466 U.S. at 693.

Judge Jack also stated that he would have given Baker the same sentences that Judge Fleming gave him. To the extent that Judge Jack may have applied a subjective standard instead of an objective one (reasonable probability), he erred, as *Strickland* calls

14

for an inquiry into the objective reasonableness of counsel's performance. Cf. *Harrington v. Richter*, 562 U.S. 86, 110, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

And Judge Jack may or may not have considered Judge Fleming's alleged philosophy in child victim cases in determining prejudice. To the extent he did so, he erred. This is because *Strickland* teaches that a particular judge's unusual propensity toward harshness or leniency, even if relevant to counsel's strategy or performance, is irrelevant to the prejudice inquiry.

> "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination." *Strickland*, 466 U.S. at 695.

Nonetheless, our application of the proper standard to evaluate prejudice results in the same conclusion as Judge Jack's—Baker fails to show prejudice sufficient to warrant resentencing.

*Strickland's application to noncapital sentencing proceedings*

The Supreme Court's jurisprudence "suggests that any amount of actual jail time has Sixth Amendment significance." *Glover v. United States*, 531 U.S. 198, 199, 121 S. Ct. 696, 148 L. Ed. 2d 604 (2001) (applying *Strickland* to a noncapital sentencing proceeding); see *Lafler v. Cooper*, 566 U.S. 156, 165, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) (stating that the *Strickland* standard applies at sentencing because any amount of

15

additional jail time given would have Sixth Amendment significance). Yet Baker cannot show a reasonable probability that his jail time would have been reduced by even one month had Marsh presented the mitigating evidence argued on appeal.

To determine *Strickland* prejudice in cases alleging a failure to investigate and present mitigation, as here, the court must "'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Ayestas v. Davis*, 584 U.S. __, 138 S. Ct. 1080, 1100, 200 L. Ed. 2d 376 (2018) (quoting *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 [2003] [finding the mitigating evidence counsel failed to discover and present was "powerful"]); see *Porter v. McCollum*, 558 U.S. 30, 41, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) (per curiam). Although Kansas cases have not addressed that issue, we apply that standard here.

Baker asserts that his counsel was ineffective for not introducing mitigating evidence to persuade the sentencing judge to sentence him to a lower grid box number rather than to the aggravated grid box number he received, or to sentence him to concurrent sentences. As Baker concedes, his ultimate claim in his 60-1507 motions is that "Marsh was ineffective for failing to put on any evidence to support his request that the sentences run concurrently." At sentencing, although Marsh requested concurrent sentences, Judge Fleming denied that request and ran the sentences for the four crimes consecutive to one another. *Baker*, 297 Kan. at 484-85.

Yet none of the mitigating evidence Baker faults Marsh for not having offered would have offset "the compelling reason stated by the judge for imposing the consecutive sentences." *Baker*, 297 Kan. at 484-85 (affirming on direct appeal the district court's imposition of consecutive sentences in this case). That compelling reason, as stated by the sentencing court and echoed by the Kansas Supreme Court, was:

16

"'[F]rankly, to take out your frustrations on an innocent baby, following what Dr. [Eric] Mitchell testified you did, I consider to be the most cowardly, egregious, disgusting kind of conduct I can imagine.' Dr. Mitchell, who performed the autopsy on the child, had testified at the hearing and described the serious injuries sustained by the child before his death, including skull fractures, brain damage, and multiple internal injuries." *Baker*, 297 Kan. at 484-85 (quoting the sentencing judge).

A.      *The district court's reasons for finding no prejudice are sound.*

The district court stated nine reasons it found no prejudice from Marsh's decision not to present any mitigating evidence:

(1) trial counsel's decision to not present mitigating evidence was based on his 20 years of experience, his knowledge of the facts of the case, and his knowledge of the sentencing judge;

(2) this decision was not arbitrary or fanciful;

(3) mitigation evidence Baker offered would not have substantially altered the sentencing profile;

(4) character evidence from family members could have aggravated Baker's sentencing profile because of introduction of his prior sexual abuse of his sisters;

(5) Baker's PTSD was based on his exposure to his mother's death and on the crime underlying this case;

(6) there is no basis to determine how much either experience contributed to Baker's PTSD;

(7) Baker's criminal history began before the events that led to his PTSD;

(8) Baker repeatedly abused the victim over time, not in a single event; and

(9) Baker tried to hide his crime by lying about it.

17

Based on those sound reasons, Judge Jack concluded that there was no reasonable probability that the sentence imposed would have been any less had Marsh offered at sentencing the mitigation evidence presented at the 60-1507 hearing. That legal conclusion is correct, and the district court's factual findings are supported by substantial competent evidence, as shown below. See *Thompson*, 293 Kan. at 715-16.

B.      *Baker has not shown a reasonable probability that, but for counsel's deficient performance, the outcome of the sentencing proceeding would have been different.*

Baker has not met his burden to show a reasonable probability that, but for counsel's deficient performance, the outcome of the sentencing proceeding would have been different. Instead, the aggravating circumstances were overwhelming and the mitigating circumstances were weak and unrelated to Baker's crimes.

1.      *The aggravating circumstances were overwhelming.*

Measured by any standard, the aggravating circumstances here were overwhelming. Three aggravating circumstances stand out, although there may well be others. First, the 19-month-old victim, whom Baker knew was an infant, was particularly vulnerable due to his youth. There is absolutely nothing the victim could have done to lessen his suffering at Baker's hands.

Second, Baker was in a trusted, confidential relationship with the victim—he was the infant's caregiver. Yet instead of taking care of the infant, Baker abused that trust and abused that infant.

Third, Baker's conduct during the commission of his crimes showed excessive brutality to the victim in a manner not normally present in those crimes. Baker committed his crimes in an especially heinous, atrocious, or cruel manner by inflicting physical

abuse before the victim's death, torturing the victim by his continual acts of violence before the murder.

Testimony by the pathologist at Baker's sentencing hearing established this aggravating factor. At the sentencing hearing, Marsh objected to this evidence, but the district court overruled that objection. The pathologist who autopsied the victim then testified, giving gruesome details of the wounds the victim suffered. Because Baker waived his preliminary hearing and then pleaded, the pathologist's undisputed and credible testimony at sentencing was the sole substantial evidence of Baker's heinous acts.

The pathologist revealed that the injuries to the infant had been inflicted over time and had not resulted from one event. He could tell, for example, that some of the infant's wounds had begun to heal. The pathologist testified that Baker's victim had suffered multiple injuries of multiple ages and had injuries to both sides of his head and abdomen. The injuries the infant suffered before his death included skull fractures, brain damage, and multiple internal injuries. His death resulted from trauma.

"There's trauma to the head where there's bruising of the soft tissues, the scalp, fracture of the skull on both sides, and damage to the underlying brain with bleed. Then bleeding in the abdomen, which was acute, superimposed upon healing injuries inside the abdomen. The mesentery, the tissues that hold the small bowel against the body wall, the back body wall, had been torn, both acutely with the hemorrhage that resulted in this child's death, and had damage that was trying to repair itself."

The injuries were "very forceful" and had caused a tear of the attachment of the organs to the body. The front of the infant's body had been compressed against his backbone so much that it caused the tissues to spread sideways and tear. The infant's injuries had been caused by excessive force from an elbow, a knee, or a hand, that went way beyond what the body can tolerate. That elbow, knee, or hand was Baker's.

19

Baker inflicted his crimes in an especially heinous, atrocious, or cruel manner, time and time again, on a very vulnerable victim. Here, as in *Strickland*, the aggravating circumstances were overwhelming, making any mitigating evidence pale in comparison. "Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." *Strickland*, 466 U.S. at 700.

2.      *The mitigating circumstances were weak.*

As to mitigation, Baker's brief challenges only Marsh's failure to present evidence of Baker's mental illness evidence, particularly PTSD. Baker has abandoned all other potentially available mitigating factors by not briefing them. See *State v. Torres*, 280 Kan. 309, 331, 121 P.3d 429 (2005). So Marsh's decision not to present character evidence from family members, testimony about Marsh's own abusive childhood, or any other mitigating factor, is not properly before us. See *State v. Meredith*, 306 Kan. 906, 909, 399 P.3d 859 (2017) (an issue not briefed is waived or abandoned). Our review in this case is limited to evidence of Baker's mental illness. But even if we were to evaluate the totality of the available mitigating evidence, along with the rebuttal evidence that the State could have produced in response, we would find no prejudice.

We focus on PTSD, as Baker does and as the district court did. Evidence of Baker's PTSD, his only mental illness diagnosis, could not have effectively mitigated Baker's heinous crimes, so as to outweigh the aggravating factors and lighten Baker's sentence. The district court properly found as much at the 60-1507 hearing in its rulings specific to PTSD. First, the district court found that Baker had committed serious crimes before his PTSD allegedly began. It credited Sward's testimony that Baker's PTSD had arisen mainly from two events:

20

- Baker's mother's death when Baker was 19; and

- Baker's criminal acts around age 25 toward the 19-month-old infant that led to his convictions here.

Yet the district court found Baker had committed serious crimes *before* either of those events occurred. And the record confirms that finding. So the district court properly questioned any connection between Baker's PTSD and his heinous abuse and murder of the vulnerable victim here.

Second, the district court found it significant that Baker had abused the infant repeatedly, rather than once. The district court explained that "[t]his wasn't someone snapping once or having a flashback or having . . . one traumatic event." The evidence supports that finding.

The district court properly questioned whether Baker's PTSD contributed to his repeated torture and eventual murder of the infant. No evidence showed that Baker's PTSD had any relevance to his crimes. The closest Sward's testimony came was to say that PTSD is not a transient disorder and Baker had PTSD at the time of his crimes, so Baker's PTSD affected his brain and actions at the time. A more general and unpersuasive statement to reduce one's moral culpability can hardly be imagined. Sward generally explained that PTSD may cause a person to panic, like how a bunny freezes when it senses danger. But his testimony fails to state how, why, or if Baker's PTSD may have lessened his moral culpability for his repeated and heinous criminal abuse and murder of a vulnerable infant, who posed no danger to Baker. No evidence at the 60-1507 hearing showed that Baker's PTSD made him less culpable than another defendant might be in the same situation.

Third, the district court found that Baker had not been honest with police but had tried to hide his crimes from them. This finding may or may not have been related to

21

PTSD. The comment certainly reflects the district court's negative view of Baker's credibility. The jury convicted Baker of obstruction of official duty for having lied to police—this marred his credibility. See K.S.A. 60-421 (crimes involving dishonesty or false statement are admissible to impeach a witness' credibility). And Sward's testimony established that Baker's PTSD diagnosis rested mostly, if not exclusively, on Baker's statements of events in his life that no other source had corroborated. So the district court's finding about Baker's dishonesty may mean that even Baker's diagnosis of PTSD rested on shaky ground. But even if the district court's finding is unrelated to PTSD, Baker's attempt to hide his crimes serves as an independent reason cutting against mitigation.

The district court properly concluded that the proffered evidence of Baker's PTSD was not enough to change his sentence at all. The mitigating circumstances were insubstantial. Even had the mitigation evidence adduced at the 60-1507 hearing been presented at the sentencing hearing, the outcome of the proceedings would have been no different. The sentencing judge would not have found that Baker's mitigating circumstances outweighed, or were as weighty as, the aggravating circumstances. Here, as in *Strickland*, "[t]he evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge." 466 U.S. at 699-700. The mitigating mental health evidence, taken as a whole, would not have influenced the sentencing judge's appraisal of Baker's moral culpability. Baker fails to show a reasonable probability that, but for counsel's deficient performance, the outcome of the sentencing proceeding would have been different. 303 Kan. at 426-27.

The mitigating evidence of PTSD in this case is weaker, and the State's evidence in support of the sentence stronger, than in our cases finding prejudice as the result of counsel's failure to investigate and present mitigating evidence. See, e.g., *Rice v. State*, No. 110,589, 2015 WL 4577279 (Kan. App. 2015) (unpublished opinion) (finding

22

prejudice where attorney presented no mitigating evidence during penalty phase of capital crime where Rice's father blamed Rice for his sister's death, "[t]urned into a mean vicious hateful drunk," subjected Rice to regular beatings, and took out a pistol and told Rice—then age 12 or 13—to leave the house and never return, thus subjecting him to an excruciating childhood).

This case is more like those that have found no prejudice to the defendant from counsel's failure to present mitigating evidence. See, e.g., *Solomon v. State*, No. 108,448, 2013 WL 2936324 (Kan. App. 2013) (finding no ineffective assistance despite counsel's failure to present the following mitigating evidence: defendant's prior convictions which elevated his current charge to a severity level 1 felony were 30 years old; and that he suffered from various medical conditions, including chronic headaches, Hepatitis C, a liver transplant, brain surgery, depression, emphysema, and anxiety); *Richmond v. State*, No. 106,885, 2012 WL 5366932 (Kan. App. 2012) (finding no prejudice where trial counsel failed to investigate and present mitigating evidence that defendant has a son he was financially responsible for; defendant's mother is disabled and he cares for her; defendant has bipolar disorder; defendant's family members would have testified on his behalf; defendant's prior conviction was when he was 16 years old and high on PCP; and defendant dropped out of school in the 6th grade).

Judge Fleming and Judge Jack got it right. Baker was not prejudiced by his counsel's decision not to present or argue mitigating evidence of Baker's mental health. Because Baker failed to meet his burden to show prejudice, we affirm the district court's conclusion that Baker failed to prove constitutionally ineffective assistance of counsel.

Affirmed.

LEBEN, J., dissenting: Our criminal-justice system uses the adversarial process to seek truth and provide fairness. On one side stands the government—with police officers and sheriff's deputies, crime labs, fingerprint and DNA databases, and prosecutors. On the other stands the defendant. This justice system works—providing a fair process to seek just results—only if the defendant has reasonably effective representation too.

The case before us tests our commitment to this fundamental premise of our justice system. The defendant, Mark Baker, committed a particularly cruel and gruesome crime—the child abuse and murder of the defenseless 19-month-old boy, Zane Pennington, who had been entrusted to Baker's care. The pathologist who did the autopsy said that Zane had skull fractures on both sides, damage to the brain with bleeding, and tears in the attachment of organs to the rest of his body. The pathologist said death was caused by trauma, eventually leading to an unrecoverable blood loss in Zane's abdomen. And he testified that "there were multiple injuries of multiple ages," not just a single beating.

All of this happened in a small town, affecting the entire community. In a statement to the Department of Corrections, sent with Baker's sentencing papers, about whether there were "any significant family or victim issues of which [the Department] should be aware that will not naturally show up in the routine paperwork," the prosecutor wrote: "Victim was a 19 month old boy. Everyone from Labette County, KS knows about this case." Labette County has about 20,000 residents and a strong local paper, the *Parsons Sun*. The prosecutor was undoubtedly correct; everyone in town knew about this case. And the facts of the case were horrific.

But our system depends on fair proceedings in all cases, not just those with innocent defendants. Baker was not innocent; he pleaded guilty to murder, child abuse,

and other charges. So there was no problem with his representation to that point—he had agreed to his guilt. The case before us involves the representation he received at his sentencing.

That too is an adversarial process—when the sentencing judge has choices to make, the State often seeks a more severe sentence than the defendant suggests, and each side presents arguments for their desired sentence. A sentencing hearing "is sufficiently like a trial in its adversarial format and in the existence of standards for decision that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland*, 466 U.S. at 686-87. While *Strickland* involved sentencing in a capital-murder case, its standard also applies to noncapital sentencings, at least when the sentencing judge has the option to give more—or less—jail time to the defendant. See *Lafler v. Cooper*, 566 U.S. 156, 165, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) (stating that the *Strickland* standard applies at sentencing because any amount of additional jail time given would have Sixth Amendment significance); *Daire v. Lattimore*, 812 F.3d 766, 767-68 (9th Cir. 2016) (en banc) (holding that *Strickland* applies to noncapital sentencing hearings); *United States v. Conner*, 456 Fed. Appx. 300, 304 (4th Cir. 2011) (unpublished opinion) (same).

Indeed, the judge at Baker's sentencing had important choices to make. He sentenced Baker that day for four offenses. On three of the offenses, the judge first had to choose the sentence length from three numbers provided under our state's guidelines. Then the judge had to make the most consequential decision: should the sentences be concurrent (all at the same time) or consecutive (one after another)? In every choice, Baker's sentencing judge chose to make the sentence as long as possible. Those choices made Baker's sentence 12 years longer than it would have been had the judge made the choices most favorable to Baker.

25

The case is before our court today because Baker brought a claim from prison arguing that the attorney who represented him at that sentencing hearing didn't do a reasonably adequate job. At sentencing, the State presented emotionally charged testimony from the pathologist who did the autopsy, and the court also heard emotional statements from Zane's mother and two of his grandparents. In the face of this, Baker's attorney made only two relevant statements:

- "I think the issue here is whether you run these sentences consecutively or concurrently, and ultimately that's your decision."
- "We have no evidence to present, Your Honor."

Baker's attorney made no argument for less than the maximum possible sentences.

In some case, perhaps, there might have been no arguments for the defense lawyer to make. That was not true here. Based on his interactions with Baker, the lawyer had wondered early in the case whether Baker had significant mental-health issues; he initially considered getting a mental-health evaluation to be sure that Baker was competent to stand trial. But that attorney did no investigation of mental-health issues that could have been presented to the court as mitigating factors for sentencing.

Had he done so, he could have presented strong evidence about Baker's childhood—that Baker had been sexually molested as a child, that Baker's mother had left the home after an argument with his father, that Baker's father had been physically violent with him, and that Baker found his mother's body when he was 19 after she had killed herself (and soon after he had reconnected with her). The attorney could have presented psychological testimony that Baker had post-traumatic-stress disorder, or PTSD. And he could have presented testimony from Baker's family members about positive aspects of Baker's life.

26

To obtain a new sentencing, Baker has to show that his attorney's representation at sentencing was deficient and that this prejudiced him. The deficiency is clear. To find prejudice, there must be a reasonable probability that the sentence would have been different with better representation. And by reasonable probability, we mean a probability sufficient to undermine our confidence in the outcome. *Strickland*, 466 U.S. at 694; *State v. Cheatham*, 296 Kan. 417, Syl. ¶ 6, 292 P.3d 318 (2013). Based on my review of the entire record before the district court, I conclude that this standard has been met and that Baker should receive a new sentencing hearing.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2011, the State charged Baker with first-degree murder, aggravated criminal sodomy, child abuse, possession of marijuana, and obstruction of official duty. Baker could not afford an attorney, so the district court appointed Samuel Marsh to represent him. By July, Marsh had negotiated a plea agreement that Baker had accepted.

Under the plea agreement, Baker pleaded guilty to felony murder, child abuse, possession of marijuana, and obstruction of official duty. In addition to reducing the murder charge from first-degree murder to felony murder, the State agreed to dismiss the aggravated-criminal-sodomy charge. The plea agreement allowed Baker to argue for the sentences for each offense to be concurrent (all at the same time) and allowed the State to argue for them to be consecutive (one after another).

With the guilty pleas to a final set of charges in place, the remaining focus of the case would be on sentencing. The trial judge would have some significant decisions to make.

One of the offenses—felony murder—is what's called an "off grid" crime. That's because it doesn't have a presumptive sentencing range from our state's sentencing

27

guidelines, where a sentencing grid comes into play. Instead, the sentence for felony murder when Baker committed this crime was life in prison with parole eligibility after serving 20 years (with no deductions for good-time credits). See K.S.A. 21-3401; K.S.A. 21-4706(c); and K.S.A. 2010 Supp. 22-3717(b)(2).

The other three offenses had presumptive sentences under the guidelines. Those guidelines provide three potential sentences based on the severity level of the offense and the defendant's criminal-history score. The three potential sentences are a mitigated (or lesser) sentence, a standard sentence, and an aggravated (or greater) sentence. For the three other offenses here, given his criminal-history score of B (the second-most-serious score), Baker faced these potential sentences:

- For child abuse, a sentence of 114 months (mitigated), 120 months (standard), or 128 months (aggravated).
- For possession of marijuana, a sentence of 10 months (mitigated), 11 months (standard), or 12 months (aggravated).
- For obstruction of official duty, a sentence of 5 months (mitigated), 6 months (standard), or 7 months (aggravated).

If the court chose the mitigated sentences for the guideline offenses, the total of these sentences could be 129 months. If the court chose the aggravated sentences, the total could be 147 months.

Even more significant, though, would be the court's decision to make the sentences consecutive or concurrent. The court had the ability to make all the sentences concurrent with one another. If the court made that choice, all of the guideline sentences would be served within the 20-year minimum sentence for the murder charge. If the court chose to make them all consecutive, however, Baker would first have to serve the 20-year minimum sentence, *then* be paroled from the underlying life sentence for felony murder,

28

and *then* serve up to another 147 months. That was the choice the district court made at sentencing.

The sentencing hearing was held September 23, 2011, about two months after Baker had entered his guilty pleas. The judge said that he had read before the hearing the victim impact statements from the boy's mother, grandmother, and a sibling. The court then asked whether any of the victim's family members wanted to be heard in court; the prosecutor introduced the boy's mother, Kerenza Collins, and the boy's paternal grandmother, Lynn Pennington. The prosecutor also read a statement from the boy's paternal grandfather, Joseph Pennington.

Quite appropriately, and as would be expected, those statements were heartfelt and powerful.

Collins said that it was "really hard to explain the pain that this man has caused me and my daughter and his other sister." She said that "[i]t's hard to explain to a 6- and 7-year-old girl why she can't ever play or see her brother again . . . ." And that "[t]he loss of her brother has changed her life forever at the hands of a man she loved and trusted." Collins spoke of "the last image I have of my son laying on a hospital bed, the blue from his eyes gone, replaced with a lifeless gray, cold to the touch, tubes coming from him, not being able to hold my son before he passed. All I could do was touch his hands. They were cold." She pledged to show up "at every parole hearing to make sure that he never gets out."

Ms. Pennington recalled that Zane "was a good boy and he was always happy and smiling." She said her granddaughter "is mad at you and said you didn't have to kill my brother. She cries for him and says if she could have only held him one more time." Regarding Baker's potential sentence, Ms. Pennington said, "I hope you never get out of prison. You don't even deserve to live."

In his written statement, read to the court by a prosecutor, Mr. Pennington directly addressed Baker's sentence: "Mark Baker should receive the maximum penalty for each and every thing he did to Zane Pennington and serve each and every sentence consecutively."

The prosecutor then asked to present two witnesses, a detective and the pathologist, "to show the Court the level of brutality that caused the injuries to Zane." The judge said that he didn't need to hear from the detective about the investigation because the prosecutor had "told me at the time of the plea what the factual basis for the plea was, that he punched Zane in the abdomen, beat his head into the floor until he fractured his skull. He admitted to that." But the court agreed to hear from the pathologist, Dr. Erik Mitchell.

The pathologist began his testimony by explaining both the cause of death and that his examination showed many injuries that had happened over time:

"Q: And what was your determination of the cause of death in this case?

"A: That we have a death that's a consequence of trauma. There's trauma to the head where there's bruising of the soft tissues, the scalp, fracture of the skull on both sides, and damage to the underlying brain with bleed. Then bleeding in the abdomen, which was acute, superimposed upon healing injuries inside the abdomen. The mesentery, the tissues that hold the small bowel against the body wall, the back body wall, had been torn, both acutely with the hemorrhage that resulted in this child's death, and had damage that was trying to repair itself.

"Q: Okay, so there were multiple injuries to this child[?]

"A: Yes, there were multiple injuries of multiple ages."

30

He testified that Zane died from abdominal bleeding, which he called "the straw that broke the camel's back." And he said he had observed an "actual tear of the attachments of the [boy's] organs to the body."

Marsh, Baker's attorney, asked no questions of Dr. Mitchell.

After presenting Dr. Mitchell's testimony, the State said it had nothing further to present. The court then turned to Marsh:

> "THE COURT: Mr. Marsh, I'll ask your client in a moment, but is there anything you want to add?
>
> "MR. MARSH: We have no evidence to present, Your Honor."

Marsh's only other comment about the sentencing choices the judge would make that day had come earlier in the hearing: "I think the issue here is whether you run these sentences consecutively or concurrently, and ultimately that's your decision." Marsh never argued that there were any mitigating circumstances that the judge should consider when sentencing Baker. Nor did he make any argument about why the judge should make any of the sentences concurrent with one another.

The defendant has a right to personally address the sentencing judge too. That went quickly:

> "THE COURT: . . . All right, Mr. Baker, you have a right to be heard. Is there anything you want to say to me or to the victims in mitigation of punishment before I pass sentence?

"[MR. BAKER]: I really can't say anything but I'm sorry 'cause it ain't going to heal the pain. Ain't going to heal anything. Ain't going to bring him back. I don't expect you all to forgive me, ever. Just know that I'm sorry."

The judge then sentenced Baker. The judge had no discretion about the life sentence on the murder conviction, with parole eligibility after 20 years. The judge began his comments with the child-abuse conviction because it was the primary (or base) sentence among the guideline offenses. The judge quickly referenced the testimony he had just heard from Dr. Mitchell:

"The mid range in the grid box is 120 months. But, frankly, to take out your frustrations on an innocent baby, following what Dr. Mitchell testified you did, I consider to be the most cowardly, egregious, disgusting kind of conduct I can imagine. And I think it certainly merits a sentence for abuse of a child in the aggravated range in the grid box. And so for that offense, I hereby sentence you to the custody of the Secretary of Corrections for 128 months.

"For the crime of murder, I sentence you to life imprisonment. And as you know, as I've indicated to you before, you will not be eligible for parole until you have served 20 years, and you'll not be eligible under that sentence for any good time credit.

"For the crime of possession of marijuana . . . , I sentence you to 12 months in the custody of the Secretary of Corrections, and for the crime of obstruction of official duty, I sentence you to 7 months. And I order that all four of those sentences run consecutive with one another."

There was also a felony marijuana charge in a separate criminal case that had been pending against Baker when he murdered Zane, and the court consolidated the sentencing in both cases. After entering the sentences we've noted, the judge sentenced Baker to 40 months on the other marijuana conviction, and the judge made that sentence consecutive to all the others. (That separate marijuana conviction and sentence are not part of this

32

appeal.) Baker's convictions and sentences were affirmed on appeal in *State v. Baker*, 297 Kan. 482, 301 P.3d 706 (2013).

After a defendant loses on direct appeal, the defendant can bring a habeas corpus action raising claims that the defense attorney provided inadequate representation. Baker did so, claiming that Marsh had provided inadequate representation at sentencing.

The district court appointed a new attorney to represent Baker on his habeas claim, and the court held an evidentiary hearing. The judge who presided over that hearing was a different one than the one who had sentenced Baker.

The court heard seven witnesses:

- Baker.
- Marsh, who had been Baker's attorney at sentencing.
- Three members of Baker's family: David Baker, his father; Brandy Baker, his sister; and Darlene Mustard, Baker's grandmother.
- Dr. Jon Sward, a mental-health professional who evaluated Baker for this hearing.
- Carl Folsom III, a lawyer who specializes in criminal defense.

In addition, of course, the court had access to the full record of Baker's underlying criminal case.

Marsh testified that the plea agreement had avoided any potential for the death penalty and had gained dismissal of the aggravated-sodomy charge. He said that he had been aware of some mental-health issues with Baker and had initially had concerns that Baker might not be competent to stand trial. He said that he eventually concluded that Baker "seemed to be competent" and never had his mental health evaluated by an expert.

33

Marsh said that Baker had told him something about Baker's mother's suicide, and Marsh said he had considered presenting Baker's mental-health issues to the sentencing court as mitigating evidence. He said he rejected that based on his views about the sentencing judge, Judge Robert Fleming:

"[M]y experience appearing before Judge Fleming, especially in child cases, was that we were probably better off going in and taking responsibility for our actions, hoping that these would be [concurrent sentences], rather than going in and trying to mitigate through psychological mumbo-jumbo, for lack of a better term."

Marsh said that he had met Baker's family members but did not recall asking any of them to testify at Baker's sentencing.

Dr. Sward had done a mental-health evaluation of Baker. He reviewed Baker's medical records, interviewed Baker, and gave Baker several psychological tests. Baker's medical records showed past methamphetamine use and prior diagnoses of PTSD, cannabis-use disorder, an adjustment disorder with depressive reaction, and an unspecified personality disorder.

Sward said that Baker had had a difficult childhood. The most significant issues Sward noted were abandonment by Baker's mother, sexual abuse, a physically abusive father and stepmother, and substance abuse that began at an early age. Sward said that Baker had psychiatric problems that began in his childhood, including dyslexia, bipolar disorder, oppositional defiant disorder, and ADHD. Sward estimated Baker's intellectual functioning as "low normal to maybe slightly below normal."

Sward concluded that Baker suffered from complex PTSD at the time of Zane's abuse and murder. Sward said that Baker had found his mother's body after she committed suicide and that this left Baker with nightmares and frequently intrusive

34

memories. Sward tied those nightmares to the offenses against Zane, noting that Baker reports an incomplete memory of his acts against Zane even though Baker knows he is the only person who could have been responsible. Sward said that those who are abused as children often become abusers themselves, not necessarily because of intent but as more of a side effect. He explained that people under high stress often revert to what they experienced their parents do in a similar situation. Sward also said that testing showed Baker may have neurological problems and behavioral disfunction, and Baker likely would be emotionally restricted and have great difficulty forming close relationships.

Folsom testified as an expert witness about what a defense lawyer should do when handling a contested sentencing hearing. At the time of the hearing, Folsom was a federal public defender in Topeka (representing indigent criminal defendants primarily in federal district court). Before becoming a federal public defender, he had been a state appellate defender (representing indigent criminal defendants on appeal in state court) and an attorney in private practice in Lawrence handling criminal-defense work.

Folsom said that he tries to put on some mitigating evidence at every sentencing hearing, something he said a defense attorney ought to do: "The standard is . . . to present some type of mitigating evidence to support the lesser sentence. That's what you're arguing for." He said it was especially important to present mitigating evidence if the State has presented evidence of aggravating circumstances: "If it's a contested hearing, . . . there is some duty to present mitigating evidence to balance the aggravating evidence."

Folsom said he typically discovers or investigates potential mitigating evidence by talking with his client or with their family. He also looks at records from past cases to look for mental-health issues, hospitalizations, and drug-treatment records.

In Baker's case, Folsom noted that Baker had received the longest possible sentence on the offenses for which the judge had discretion. He noted that "the judge didn't really have any discretion" about the life sentence for murder. But Folsom said that Marsh's representation at sentencing fell below an objective standard of reasonableness because there was powerful mitigating evidence of Baker's mental illness that was neither investigated nor presented to the district court. Folsom said that Marsh's failure to present any mitigating evidence could not have been a reasonable strategic decision:

"In my opinion, to present no mitigating evidence or no mitigating argument, I think that there's no strategic decision there. It's one thing if there was a choice between this mitigating evidence and [that] mitigating evidence, if they're somehow conflicting. But there was . . . no argument for the mitigated sentence in any of the sentencing ranges. There was no argument for any of the sentence[s] to be concurrent with one another. There was no evidence presented on that mitigating evidence. So in my opinion, there's no strategic decision there if you don't present anything."

The testimony of Baker and his family largely related to what Marsh could have learned in an investigation by contacting them and what mitigating evidence they might have presented at sentencing. Baker testified that he had been in and out of juvenile facilities and mental hospitals throughout his life. His sister, Brandy Baker, testified that Baker had expressed remorse for his actions and that she would have testified to his general good character at sentencing had she been asked. She also testified, though, that Baker had molested her when she was 5 or 6; Baker's father testified that Baker was 12 years old when he molested his sister. The father and grandmother also said that they would have testified to Baker's general good character. They all said that Marsh hadn't contacted them about the possibility of giving testimony at Baker's sentencing.

After hearing this evidence, the district court denied relief in a detailed oral ruling. The court recognized that it had to apply the *Strickland* test, first determining whether Marsh provided adequate representation and, if Marsh did not, then determining whether

36

the harm was enough to cast sufficient doubt on whether the sentencing outcome would have been different with appropriate representation.

On the first question, whether Marsh provided adequate representation, the court said it was "a very close question." The court said that "Mr. Marsh probably should have investigated further" but that it wasn't certain that he was "required to under Kansas law." The court noted that Marsh said "he had made a decision, a tactical decision, not to present evidence of Mr. Baker's mental condition because he did not think it would be accepted by Judge Fleming," the sentencing judge. The court said Marsh had based his decision "on his 20 years of experience as a criminal defense lawyer in southeast Kansas and of his knowledge of the particulars of this case and of the judge that he was appearing in front of." The court also said that while Folsom "qualified as an expert," he didn't handle cases in southeast Kansas and was therefore "in a slightly different position than Mr. Marsh [was] in." The court said it would consider Folsom's opinion but was "not giving as much weight to his opinion as if he was the trial attorney in southeast Kansas in state courts."

After making those statements, though, the court chose to move on to the second *Strickland* question "without making a definitive ruling on the first prong." The court recognized that it must determine whether there was a reasonable probability that different sentences would have been rendered. The court then concluded that Baker hadn't met this *Strickland* requirement because it was unlikely that Judge Fleming would have sentenced differently even had he heard the additional evidence:

> "Now the [courts] use a reasonable probability standard all the time. We use it in
> probable cause hearings. We use it in weighing civil cases. It's quite commonly used. But
> if we break it down, reasonable means not wishful thinking or supposition but based on
> reason and logic. And probability is not possibility. But probability[,] is it more likely
> than not? So is there a logical reason to think that it would be more likely than not that
> Judge Fleming would have made a different decision if this evidence had been presented?

37

"Now, as I said, Mr. Marsh weighed his experience with Judge Fleming and [Judge Fleming's] philosophy involving child victim cases in making the decision he thought it would be better for . . . Mr. Baker[] to take responsibility rather than offer mitigating factors. Would it have been a different decision if he had or would it have been a different outcome if he had changed his mind or done something different? It's possible, but I don't think it's probabl[e]. This Court believes and finds that even if the mitigating evidence had been presented that the . . . aggravating factors would have more probably than not resulted in Judge Fleming imposing consecutive rather than concurrent sentences."

In addition, the judge said that had he been the sentencing judge and heard everything that had been presented in the habeas hearing, he would have given the same sentences as Judge Fleming had: "That's what I would do if I were sentencing Mr. Baker today."

ANALYSIS

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. Claiming a violation of that right, Baker has to show two things under *Strickland* to get a new sentencing hearing: (1) that Marsh's representation was below minimum standards and thus constitutionally deficient and (2) that the attorney's substandard work prejudiced Baker. *Mattox v. State*, 293 Kan. 723, Syl. ¶ 1, 267 P.3d 746 (2011). Prejudice is shown if there is a "reasonable probability" that the proceeding's outcome would have been different had the representation been adequate. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cheatham*, 296 Kan. 417, Syl. ¶ 6.

Here, then, Baker had to show that Marsh's representation was inadequate and undermines our confidence in the sentences imposed. On appeal, we must accept the district court's factual findings that are supported by substantial evidence. We then

38

independently review its legal conclusions without any required deference to its decision. *Miller v. State*, 298 Kan. 921, 928, 318 P.3d 155 (2014).

The facts really aren't in dispute. Marsh didn't investigate potential evidence he could present in support of lesser sentences, and he didn't make any arguments at the sentencing hearing for them, either. He says he concluded that based on his personal experience with Judge Fleming, the best way to proceed would be for Baker to take full responsibility and not offer any mitigation argument. In this appeal, we must decide whether Baker's presentation satisfied the *Strickland* standards.

*Marsh's Representation Was Inadequate.*

Even if Marsh's testimony accurately reflected Judge Fleming's views, it could not support Marsh's complete failure both to investigate potential evidence in Baker's favor and to make any arguments at sentencing on Baker's behalf.

Let's start with the failure to investigate potential evidence in Baker's favor. An attorney's strategic choice made after a thorough investigation is virtually unchallengeable, but one made after a less-than-complete investigation is reasonable only if based on a reasonable professional judgment. *Holmes v. State*, 292 Kan. 271, Syl. ¶ 6, 252 P.3d 573 (2011). Marsh didn't have anyone evaluate Baker's mental health and didn't interview Baker's family members about factors that might have led Baker to commit the murder.

Folsom, a criminal-defense attorney, explained that a reasonable investigation would have led Marsh to learn about Baker's mother's suicide, about Baker finding the body, and "should have created a kind of an obvious idea that [Baker] might be suffering from some kind of post-traumatic stress disorder, which was verified by Dr. Sward." Folsom testified that a reasonable investigation would have led to a mental-health

39

evaluation and "some very powerful mitigating evidence." Folsom also testified that the brutality of the crime "raises the question of why, and the obvious answer is there must be some kind of mental illness going on. So if I got this case, I would have absolutely immediately had him evaluated, Mr. Baker, evaluated for mental health issues, just based on the facts of the case alone."

The district court said it was considering Folsom's testimony but discounting it a bit because Folsom didn't practice in southeast Kansas. I would not discount Folsom's testimony on that basis.

Before *Strickland*, the Kansas Supreme Court did focus on community standards for determining what constituted adequate representation. E.g., *State v. Schrum*, 226 Kan. 125, 127, 595 P.2d 1127 (1979). When the Kansas Supreme Court first applied *Strickland*, it noted that the existing Kansas test "required proof of counsel's conduct substantially deviating from that expected of a reasonably competent lawyer in the community," while *Strickland* "require[d] proof the conduct was not reasonable considering all the circumstances." *Chamberlain v. State*, 236 Kan. 650, 656, 694 P.2d 468 (1985). The court recognized that past Kansas caselaw and guidelines would "remain viable" in determining whether an attorney's conduct was reasonable. 236 Kan. 650, Syl. ¶ 4.

In its cases, the United States Supreme Court has relied on both national and statewide standards as relevant considerations in determining whether an attorney has provided reasonable representation under prevailing professional norms. E.g., *Cullen v. Pinholster*, 563 U.S. 170, 191, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (citing general knowledge of the defense bar in California); *Padilla v. Kentucky*, 559 U.S. 356, 366-67, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010) (citing American Bar Association standards); see 3 LaFave, Israel, King & Kerr, Criminal Procedure § 11.10(b) (4th ed. 2015). No testimony in our case suggested that lawyers do less adequate work or have different

40

professional standards in some parts of Kansas than others, and a defendant in Baker's situation would be subject to the same potential sentences no matter where in the state the crimes had been committed. The district court should not have discounted Folsom's testimony even though he has not practiced in every part of Kansas.

When considering Folsom's testimony about the duty to investigate, he makes some good points. The horrific facts of this case by themselves raise questions about possible mental illness: why would the 25-year-old Baker have acted so brutally with a 19-month-old infant? And an attorney's interactions with Baker would have suggested some mental-health issues—as they did to Marsh. Yet Marsh did not follow up with an investigation into Baker's mental health.

That failure looms large because this was not a run-of-the-mill sentencing for some minor offense. Baker had been convicted of murder as well as three other felonies. As we have already explained, the sentencing judge would have the choice of adding up to 147 additional months to the sentence Baker would automatically receive on the murder conviction—life in prison with a chance at parole after 20 years. The judge would also have the choice of making the sentences on the three additional offenses concurrent with the life sentence. In that case, Marsh would have been eligible for parole—not subject to years of further imprisonment—at the end of the 20-year parole-eligibility period. As we know, though, each time the judge had discretion, the judge chose to run Baker's sentences as long as possible.

Marsh said that he made the tactical choice not to present any "psychological mumbo-jumbo" because he concluded "we were probably better off going in and taking responsibility for our actions." But presenting evidence about Baker's mental-health issues, including PTSD, would not have precluded Baker from personally accepting responsibility. Explaining why Baker might have committed the offense and accepting

responsibility weren't necessarily inconsistent—and Marsh couldn't conclude otherwise without doing a reasonable investigation.

So Marsh had a duty to conduct a reasonable investigation into potential evidence he could present in favor of shorter sentences. I agree with Folsom that Marsh failed in that duty. And without a reasonable investigation, his strategic choice not to present *any* evidence or argument in favor of lesser sentences is indefensible. An attorney exercising reasonable professional judgment would have conducted an investigation into Baker's mental health and other evidence that might support lesser sentences. And an attorney exercising reasonable professional judgment would have presented at least some evidence and argument in favor of lesser sentences at the sentencing hearing.

*Marsh's Inadequate Representation Prejudiced Baker.*

That brings us to the key question in this appeal—whether Marsh's inadequate representation prejudiced Baker. Because there are no significant factual disputes, we make this review independently, without deference to the trial court. But before I go through my independent analysis of the prejudice issue, I want to note three respects in which the trial court's analysis was off the mark.

First, the court stated the test as whether it was "more likely than not" that proper representation would have led to a different outcome. That's not the *Strickland* test. *Strickland* does say that the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. But the Court explained that reasonable probability doesn't mean more likely than not: "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." 466 U.S. at 693. Rather, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have

42

determined the outcome." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. That is a lower threshold than the preponderance-of-the-evidence (more-likely-than-not) standard. *Hobdy v. Raemisch*, 916 F.3d 863, 877 (10th Cir. 2019).

Second, the court considered the sentencing practices of Judge Fleming when deciding whether Baker had shown prejudice. *Strickland* also directed that "a particular judge's sentencing practices[] should not be considered in the prejudice determination." 466 U.S. at 695. The prejudice inquiry is based on an independent review of all the circumstances and "should not depend on the idiosyncracies of the particular decisionmaker." 466 U.S. at 695.

Third, the court also said it had determined that it would have rendered the same sentences had it been sentencing the defendant after hearing the additional evidence not presented at sentencing. But that basis for the decision once again returns to a more-likely-than-not proof requirement. Even though the evidence didn't convince this judge that he would have entered a different sentence, a lesser burden (reasonable probability) applied.

The proper question is: was there a reasonable probability of a different outcome sufficient to undermine our confidence in the outcome?

On this question, reasonable judges sometimes reach different conclusions. In *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), for example, a 7-2 Supreme Court held that the failure to present mitigating evidence in a death-penalty sentencing hearing was inadequate and prejudiced the defendant. In addition to the dissenting justices, both the intermediate federal appellate court and Maryland's highest state court had rejected the defendant's claim.

43

But while reasonable judges may differ, I conclude that Baker has shown a reasonable probability that undermines my confidence in the outcome of his sentencing hearing. The facts underlying his murder conviction were horrific. But there were significant facts that could have been presented in support of lesser overall sentences. And there were arguments that could have been made on his behalf.

For example, two of the crimes for which he was sentenced here were possession of marijuana and obstruction of official duty. Baker's attorney could reasonably argue that in light of the significant sentences he would receive for murder and a separate felony-child-abuse conviction, the sentences for these lesser crimes should be concurrent, not consecutive. Baker's attorney could surely argue that there was nothing "aggravated" about Baker's marijuana-possession offense that would justify choosing the aggravated (higher) sentence on that conviction. Other arguments could be made as well, but none were made by Marsh.

Given the lack of *any* arguments or evidence at sentencing on Baker's behalf, my confidence in the outcome of that hearing is so undermined that I would order a new sentencing. It's true that there were many aggravating circumstances in Baker's case surrounding his convictions for murder and felony child abuse, and they were powerful. But they didn't apply to all of the offenses, and there were strong arguments and evidence that could have been presented on Baker's behalf.

Would the sentencing judge still have made *every* sentence the longest possible and made all the sentences consecutive to one another? I've sat as a sentencing judge many times, and those are not easy calls. But the issue before me today is whether there is a reasonable probability of different sentences sufficient to undermine my confidence in the outcome. For me, that test has been met.

I do not express any opinion on what sentences should be given to Baker on resentencing. That's a weighty responsibility for any sentencing judge. It could be that the same sentences are given. Even if they are, though, there's a purpose served here in vacating Baker's sentences and remanding for a new sentencing hearing. Baker is entitled to a sentencing hearing at which he is meaningfully represented.

*Baker Has Not Waived Part of His Claim.*

At the evidentiary hearing on Baker's habeas claim, he presented the testimony of his sister, his father, and his grandmother. Their testimony, spanning 23 transcript pages, told about Baker's general good character, his remorse for these crimes, and his troubled youth. The majority ignores that evidence, saying that Baker waived the ability to rely on it in this appeal because his appellate brief didn't adequately address it.

It's true that an appellate court can deem some issue or argument to have been waived by inadequate briefing. But waiver for inadequate briefing is a discretionary rule that we may choose to apply, not a jurisdictional bar. See *State v. Great Plains of Kiowa County, Inc.*, 308 Kan. 950, 953, 425 P.34d 290 (2018). And as this same three-judge panel said recently in another case, briefing is only inadequate when a party "makes no arguments at all" on an issue. *State v. Hinnenkamp*, 57 Kan. App. 2d 1, 6, 446 P.3d 1103 (2019), *petition for rev. filed* August 2, 2019.

That's not what has happened here. Baker has consistently argued that Marsh's failure to present family-member testimony was part of his Sixth Amendment claim. Baker's brief summarized the testimony of his sister, father, and grandmother; the brief cited appropriately to the transcripts of their testimony. Then under the heading, "Preservation of the Issue," the brief noted that "Mr. Baker raised the issue of his counsel's ineffectiveness for failing to investigate and present mitigation evidence at his

45

sentencing hearing." That statement was not limited to PTSD evidence; it also would reasonably refer to the family testimony already set out earlier in the brief.

Baker's brief does say that it will "focus" on the PTSD evidence because "the district court found the most compelling argument to be that Mr. Baker did not investigate or present testimony on Mr. Baker's mental illnesses, particularly his PTSD." But we should not take that as a waiver of consideration of the family testimony: a party does not waive an argument merely because of some oddity in the way the party has framed that argument. *Hinnenkamp*, 57 Kan. App. 2d at 6-7. And the State made no suggestion that Baker's brief was inadequate on this point. Instead, the State's brief on appeal described the testimony of each of the family members, and later in the State's brief it mentioned that testimony in the conclusion of its argument:

> "Unlike *Strickland*, Mr. Baker was able to produce the mitigating evidence of family support, mental health issue[s], and experts to convince a new judge. The court listened to all the evidence and still found the original sentencing was justified in running all counts and cases consecutive. . . . This conclusively establishes that he cannot establish prejudice."

Throughout the proceedings in his original criminal case and in this habeas case, Baker has been unable to afford an attorney. So the court has appointed one for him. Deeming an issue waived by inadequate briefing from an appointed counsel should only be done when the arguments made are so vague or incomprehensible that we can't fairly address them. "Rules of practice and procedure are designed to promote the ends of justice, not to defeat them. . . . Orderly rules of procedure do not require sacrifice of the rules of fundamental justice." *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S. Ct. 719, 85 L. Ed. 1037 (1941). Deeming part of Baker's argument waived based on a claim that his appointed attorney inadequately briefed it does not promote the ends of justice.

46

*Remand to a Different Judge*

While the majority has determined that Baker will not receive the new sentencing hearing I believe he is entitled to, I want to address one additional issue Baker raised about his requested new sentencing hearing. Baker has asked that we have a different judge handle the resentencing hearing. The defendant notes that the judge said at the habeas hearing that he would give Baker the same sentence Judge Fleming had if that had been the issue before him that day. Baker argues that when a judge has predetermined the outcome, principles of judicial neutrality suggest assigning the case to a new judge who hasn't already committed to a specific outcome.

There's support for Baker's position. In *State v. Urista*, 296 Kan. 576, 293 P.3d 738 (2013), the Kansas Supreme Court found that the prosecutor had breached a plea agreement at sentencing. The defendant's sentence was vacated and a new hearing ordered before a different judge. The court said that "[t]he appearance of judicial neutrality will be best served if the new sentencing hearing is conducted by a different judge." 296 Kan. at 595.

I believe that to be the case here too. It is important that those appearing in our courts have confidence that a fair hearing has been provided to them. "Procedural fairness is necessary to the perceived legitimacy of the law." *Scott v. United States*, 890 F.3d 1239, 1252 (11th Cir. 2018). By suggesting that we should remand for resentencing by a different judge, I do not suggest—and have not concluded—that the judge who heard Baker's habeas claims is actually biased or unfair. I merely conclude that since the judge has stated that he would give a specific sentence to Baker, the appearance of fairness would be enhanced by having a new judge handle Baker's resentencing.

I would vacate Baker's sentences and remand the case for resentencing before a different judge.